THOMAS v. CINCINNATI, N. O. & T. P. RY. CO.

In re PHELAN.

(Circuit Court, S. D. Ohio, W. D.   July 13, 1894.)

1. CONTEMPT—INTERFERENCE WITH RECEIVER—IMPEDING OPERATION OF RAILROAD.
    Any willful attempt, with knowledge that a railroad is in the hands of the court, to prevent or impede the receiver thereof appointed by the court from complying with the order of the court in running the road, which is unlawful, and which, as between private individuals, would give a right of action for damages, is a contempt of the order of the court.

**2. SAME—INSTIGATING STRIKE—UNLAWFUL COMBINATION.**

Maliciously inciting employés of a receiver, who is operating a railroad under order of the court, to leave his employ, in pursuance of an unlawful combination to prevent the operation of the road, thereby inflicting injuries on its business, for which damages would be recoverable if it were operated by a private corporation, is a contempt of the court.

**3. SAME — CONSTITUTIONAL GUARANTY OF RIGHT OF ASSEMBLY AND FREE SPEECH.**

Such inciting to carry out an unlawful conspiracy is not protected by constitutional guaranties of the right of assembly and free speech, and is not less a contempt because effected by words only, if the obstruction to the operation of the road by the receiver is unlawful and malicious.

**4. CONSPIRACY—COMBINATION TO COMPEL BREACH OF CONTRACT.**

A combination to inflict pecuniary injury on the owner of cars, operated by railway companies under contracts with him, by compelling them to give up using his cars, in violation of their contracts, and, on their refusal, to inflict pecuniary injury on them by inciting their employés to quit their service, and thus paralyze their business, the existence of the contracts being known to the parties so combining, is an unlawful conspiracy.

**5. SAME—BOYCOTT.**

A combination by employés of railway companies to injure in his business the owner of cars operated by the companies, by compelling them to cease using his cars by threats of quitting and by actually quitting their service, thereby inflicting on them great injury, where the relation between him and the companies is mutually profitable, and has no effect whatever on the character or reward of the services of the employés so combining, is a boycott, and an unlawful conspiracy at common law.

**6. SAME—UNLAWFUL PURPOSE.**

A combination to incite the employés of all the railways in the country to suddenly quit their service, without any dissatisfaction with the terms of their employment, thus paralyzing utterly all railway traffic, in order to starve the railroad companies and the public into compelling an owner of cars used in operating the roads to pay his employés more wages, they having no lawful right so to compel him, is an unlawful conspiracy by reason of its purpose, whether such purpose is effected by means usually lawful or otherwise.

**7. SAME—RESTRAINT OF INTERSTATE COMMERCE.**

Such combination, its purpose being to paralyze the interstate commerce of the country, is an unlawful conspiracy, within the act of July 2, 1890, declaring illegal every contract, combination, or conspiracy in restraint of trade or commerce among the several states. U. S. v. Patterson, 55 Fed. 605, disapproved.

**8. SAME—OBSTRUCTING MAILS.**

Such combination, where the members intend to stop all mail trains as well as other trains, and do delay many, in violation of Rev. St. § 3995, punishing any one willfully and knowingly obstructing or retarding the passage of the mails, is an unlawful conspiracy, although the obstruction is effected by merely quitting employment.

This was a suit by Samuel Thomas against the Cincinnati, New Orleans & Texas Pacific Railway Company, in which Samuel M. Felton was appointed receiver. The receiver filed a petition for the commitment of F. W. Phelan for contempt, and for an injunction against him.

Harmon, Colston, Goldsmith & Hoadly, for receiver.
Cogan & Shay, for Phelan.

TAFT, Circuit Judge. Samuel M. Felton was appointed receiver in the above-entitled cause, March 18, 1893, and has ever since been

engaged, under the order of the court, in operating the railroad of the Cincinnati, New Orleans & Texas Pacific Railway Company, which is more commonly known as the Cincinnati Southern Railroad. On Monday, July 2, 1894, he filed an intervening petition in the original action, in which he stated that during the previous week, and at the time of filing the petition, he was greatly impeded in the operation of the road by a strike of his employés, and of the employés of other railroads in the city of Cincinnati, who were prevented from receiving from him and delivering to him freight carried or to be carried over his road; that said strike was the result of a conspiracy between one F. W. Phelan, now in Cincinnati, and one Eugene V. Debs and others, to tie up the road operated, as the said conspirators well knew, by the petitioner as receiver, and other roads in the western states of the United States, until certain demands or alleged grievance of certain persons not in the employ of the receiver or of any other railroad of the United States were acceded to by persons in no manner connected with the management of any railroad of the United States; that the demand of the employés of one George M. Pullman, or the Pullman Palace Car Company, at Pullman, Ill., for higher wages was refused, whereupon said Debs, Phelan, and others, members of an organization known as the American Railway Union, combined and conspired with each other and with sundry persons, who became members of the organization for the purpose, to compel the Pullman Company to comply with the demands of its employés, and that for the purpose of injuring the Pullman Company, and of thereby forcing from it the concession demanded, Debs, Phelan, and the others named had maliciously conspired and undertaken to prevent the receiver of this court and the owners of other railroads from using Pullman cars in operating their roads, though they are under contract to do so; that in pursuance of said conspiracy Phelan, a resident of Oregon, came to Cincinnati a week before the filing of the petition, and set on foot and incited a strike among the employés of the receiver, and of other railroad companies whose lines run into Cincinnati; that on June 27th, and at other times and places, Phelan made inflammatory speeches to such employés, well knowing many of them to be employés of the receiver, in which he urged them all to quit the service of the receiver and the other railroads of the city, and to tie them all up, and to prevent others from taking their places, by persuasion if possible, by clubbing if necessary; that said Phelan was still in the city, directing and continuing the strike, and interfering with the receiver in the operation of the road; that as a result of the conspiracy and strike the receiver had been obliged at great expense to secure and maintain the protection of armed men for his employés; and that all of the foregoing constituted a contempt of this court, and a ground both for committing Phelan and for enjoining him from a continuance of said acts.

Upon the filing of the petition an attachment was issued for Phelan, the contemner, and on the morning of the 3d of July he was arrested, and brought before the court. He was admitted to bail, and at the same time was enjoined by order of the court from, either as an individual or in combination with others, inciting, encouraging, order-

ing, or in any other manner causing the employés of the receiver to
leave his employ with intent to obstruct the operation of his road,
and thereby to compel him not to fulfill his contract and carry Pull-
man cars.    On Thursday, July 5th, the motion of the receiver for
Phelan's commitment came on to be heard, and a week has since
been taken up in the giving of testimony and argument.

I propose first to run over the evidence, as briefly as may be, and
determine the facts, and then to consider the law applicable to them.

The American Railway Union is an organization of railway em-
ployés, to which are eligible as members all persons in the service of
railways below a certain rank.    It was organized in June, 1893.
On May 11, 1894, at Pullman, Ill., the employés of the Pullman Palace
Car Company, engaged in manufacturing railway cars of all kinds, in-
cluding sleeping cars, left the company's employ because of its re-
fusal to restore wages which had been reduced during the preceding
year, and the works were then closed.    On June 11, 1894, the gen-
eral convention of the American Railway Union met at Chicago, and
decided that the American Railway Union would take measures to
compel the Pullman Company to resume business and to re-employ its
employés who had left its service on terms to be fixed by arbitration.
It does not appear that at this time the Pullman Company's employés
were members of the Railway Union, or eligible as such.    At the
June convention of 1894 there were present representatives from
450 lodges of the union, and the number of members, as estimated at
that time, was 250,000.    It is said that the local unions had voted
for the Pullman boycott before the convention met.    The question
where the boycott originated is not very material, but it may be said
that, as the Pullman strike occurred but a month before the conven-
tion, and as it had been deemed necessary by the union to send men
all over the country to explain to its members the merits of the Pull-
man controversy during the boycott, it is obvious that the boycott
had its real origin in the union convention at Chicago, where the sub-
ject was brought before it, presumably by its board of directors.

The chief governing body of the union is a board of directors, which
elects a president, vice president, and secretary, who are the chief
executive officers of the union.    Eugene V. Debs is, and has been
since its organization, the president.    Section 6 of the constitution
of the union, as adopted in June, 1893, provides that "the board is
empowered to provide such rules, issue such orders, and adopt such
measures as may be required to carry out the objects of the order,
provided that no action shall be taken that conflicts with this consti-
tution."    By section 11 of the same instrument the president's powers
are thus described:

"It shall be the duty of the president to preside over the meetings of the
board and the quadrennial meetings of the general union.    He shall at each
annual meeting of the board and at each quadrennial meeting of the general
union submit a report of the transactions of his office, and make such recom-
mendations as he may deem necessary to the welfare of the order.    He shall
enforce the laws of the order, sign all charters, circulars, reports, and other
documents requiring authentication.    He shall decide all questions and ap-
peals, which decisions shall be final, unless otherwise ordered by the board.
He may, with the concurrence of the board, deputize any member to perform
any required service, issue dispensations not inconsistent with the constitution

or regulations of the order, and perform such other duties as his office may impose; and he shall receive such compensation for his services as may be determined at the time of his election."

Phelan, when on the stand, said that these were sections of the old constitution, but that he understood the constitution had been generally changed. He would not say that extensive or material changes had been made, but simply that general changes had been effected. He was in attendance as a delegate only during the last five days of the convention, and this is his explanation for not knowing what the changes were. Phelan's answers on this subject had really no effect to show that the foregoing sections are not still in force, but simply illustrated the evasiveness and verbal quibbling to which the witness was continually willing to resort under examination. It is certainly strange that if he was here, as he says, as a representative of the union, he should not know the changes, if any really material ones had been made in the constitution, under which he was initiating men into the union, and was receiving orders from his superior officers. We shall see, as we progress, that the two sections of the old constitution are still in force, if we can judge at all from the actual authority exercised by the officers of the union during the present boycott.

The plan of the boycott, as shown by the evidence, was this: Pullman cars are used on a large majority of the railways of the country. The members of the American Railway Union whose duty it was to handle Pullman cars on such railways were to refuse to do so, with the hope that the railway companies, fearing a strike, would decline further to haul them in their trains, and inflict a great pecuniary injury upon the Pullman Company. In case the railway companies failed to yield to the demand, every effort was to be made to tie up and cripple the doing of any business whatever by them, and particular attention was to be directed to the freight traffic, which it was known was their chief source of revenue. As the lodges of the American Railway Union extended from the Allegheny mountains to the Pacific coast, it will be seen that it was contemplated by those engaged in carrying out this plan that, in case of a refusal of the railway companies to join the union in its attack upon the Pullman Company, there should be a paralysis of all railway traffic of every kind throughout that vast territory traversed by lines using Pullman cars. It was to be accomplished, not only by the then members of the union, but also by procuring, through persuasion and appeal, all employés not members either to join the union or to strike without joining, by guarantying that, if they would strike, the union would not allow one of its members to return to work until they also were restored. I shall allude again to the gigantic character of this combination. For my present purpose, it is sufficient to say that on Sunday, June 24th, Phelan came to Cincinnati as the authorized representative of the president and board of directors of the union, to enforce and carry out the contemplated boycott and paralysis of business on all railway lines running into Cincinnati which used Pullman cars until they should cease to use them.

I am aware that Phelan denies that such were his authority and instructions, but, as in the case of his answers in respect to the constitution and its provisions, his denials do not, in view of the overwhelming proof of the circumstances not denied, and his previous admissions not denied, show the fact to be otherwise, but only decrease the reliance which can be placed on any statement made by him in this case. He says that he came here with no direction except to visit the employés of the Pullman Company at a branch factory at Ludlow, to explain to them the merits of the controversy between their employer and their fellows at Chicago, and then, if they struck, to see that they appointed committees who should keep order among them, and look after the sick. At another time he says he was directed to be in Cincinnati during the boycott, but he strenuously denies he was here for the purpose of laying on the boycott or inciting a general strike. He would have the court believe that what occurred was wholly spontaneous, and not through his agency, and that his business was, if there should be such coincidental spontaneity resulting in a strike, to prevent disorder, and to look after the sick. This hardly accords with his first telegram to Debs, his chief officer, dated noon, Tuesday, June 26th, as follows: "Pay no attention to press reports. To be effective, was compelled to postpone action until seven, Wednesday morning." On Sunday, June 24th, after Phelan's explanation of the Pullman troubles, the Pullman employés at Ludlow determined to strike, and did so Monday morning at 7 o'clock. Phelan says he did not advise them to strike, but just explained the situation, and then a strike followed. When he had explained, and organized committees among the strikers, after the strike had occurred, through no agency of his, his mission was ended, so far as his instructions went. And yet we find him on Tuesday, June 26th, at 12 o'clock noon, telegraphing his chief that he was obliged to postpone action until Wednesday morning at 7, in order to be effective. Now, what action was this which he hoped to make effective? Can any one doubt for an instant that the action thus foreshadowed was that referred to in Phelan's dispatch to Debs of June 28th following, when he said, "The tie-up is successful"? On Tuesday night, June 26th, there was a meeting of all the switchmen of Cincinnati at Wuebler's Hall. There is no direct evidence how this meeting was called, but the circumstances leave no doubt. Phelan, having brought out the Pullman men, then set to work upon the railway men, and hence the meeting. The telegram of June 26th indicates that Debs expected him to have the meeting and action earlier, but that he was not able to secure an attendance at any earlier meeting sufficiently general to make the action taken effective. Indeed, when the Tuesday night meeting was held, it was found that action must be still further delayed, and a second meeting for Wednesday night was called. At both of these meetings Phelan explained and discussed the Pullman trouble, and announced the Pullman boycott. Now, what was his object? Was it for the purpose of inducing the men whom he addressed, and others not present, whom he urged them to talk to, to demand of the railway companies assistance in boycotting Pullman, and, on refusal,

to tie them up, or was it simply for their general information? He repeats upon the stand with much emphasis that he at no time advised any man to strike. What was he doing? His speeches were all directed to that end, and, even if he did not use the word "advise," his conduct was exactly the same as if he had. His trifling with the truth, and his attempt to seek shelter again behind verbal quibbles, simply disparages him as a witness, without concealing the facts. Now, what was done at these meetings of Tuesday and Wednesday night after or during Phelan's speeches? A city committee was appointed, consisting of one employé of each of the great railroads entering the city. This committee Phelan continually refers to in his testimony as "my committee," and the term was properly used, for it seems to have spent all its time in his company, and doing his bidding. On this committee was J. Madison, a switchman in the receiver's employ. The first duty of each member of the committee was on Wednesday, June 27th, or on the next day, to notify the yard master of his road that the switchmen and members of the American Railway Union would not handle Pullman cars because a boycott had been laid on them. Madison duly notified McCarty, the yard master of the receiver. The necessary result was that three switchmen on the Cincinnati, Hamilton & Dayton Railroad were discharged or relieved of duty on the afternoon of Thursday, June 28th, and within six hours a general strike of all the switchmen and yard men, including yard engineers and firemen, on all the roads coming into Cincinnati, took place. This was exactly in accordance with the plan which Phelan had outlined to Westcott, a reporter for the Enquirer, on Tuesday or Wednesday before the strike, in a conversation which he does not deny. Beginning with Tuesday night, June 26th, Phelan has made speeches every night since, in which he has continued to explain the Pullman trouble to audiences of railroad men, and has read telegrams from Debs of a character calculated to incite and encourage all railway employés to quit their places, to assist in the Pullman boycott. He says he has made as many as 20 speeches. Two, at least, were made at Ludlow, Ky., a railroad town, the inhabitants of which are, or were, many of them, employés of the receiver. It is in evidence that when the meetings began the number of the receiver's employés who were members of the American Railway Union was 150. And yet Phelan denies that he is in any sense responsible for the strike of the receiver's employés, or of those of any other road in town, or for the paralysis of business which followed.

It is marvelous that Phelan can assume such a position in view of the circumstances and his own declarations. Take the evidence of Westcott, the Enquirer reporter, a witness evidently of much experience in acquiring and detailing accurate information, who has no motive to misrepresent Phelan in any way. He was assigned to report the strike, and seems to have found Phelan his best source of information. He made notes of everything at the time, and prepared them afterwards for publication. Phelan has not attempted to deny anything he says. Westcott testifies that Phelan told him before the strike that his main object in coming here was

to enforce a boycott against Pullman cars, by tying up every road in Cincinnati for the American Railway Union; that he frequently and constantly repeated the statement that they intended to tie up every road in town, and keep them tied up until they refused to handle Pullman cars; that after the strike on Thursday he said he had most of the American Railway Union men out in Cincinnati, Ludlow, and Covington, and that those who were not out would be out the next morning; that after his arrest he explained that his course had been to tie up the freight trains, and not so much to stop passenger trains, because the money was in the freight business. Schaff, Gibson, and Bender, officers of the Big Four Railroad, testify that Phelan said to them on Thursday afternoon, when they met him for the purpose of seeing whether the "embargo," as Phelan and Debs expressed it, could not be lifted from the Big Four, because it was a Wagner sleeping car line, that he proposed to tie up every line in town, and was in a hurry, because he must go over and tie up the Pan Handle and the C. & O. before sunset; and that, just to show Schaff what he could do, he had called out some more of the Big Four employés. Phelan and those members of the city committee who accompanied him to this meeting deny that this was said, but by their denial show nothing save that their loyalty to their chief is greater than their regard for the sanctity of their oaths. Westcott, the Enquirer reporter, talked with Phelan about this Schaff interview, and Phelan said that, as Schaff tried to "bluff" him, he had called out some more of his men, to show that he had no hard feelings; and when Westcott expressed surprise at that way of showing friendliness, Phelan said that was the way the American Railway Union showed its friendliness in a fight. On June 28th, the day of the strike, Debs telegraphed Phelan to let the Big Four alone, if not handling Pullmans, to which Phelan answered: "I cannot keep others out if Big Four is excepted. The rest are emphatic on all together or none. The tie-up is successful. Once more will Big Four be let alone." If Phelan was not the chief agent and inciter of the general tie-up in Cincinnati, he has been most unfortunate in the use of the language in his telegrams. What he here said necessarily implied that he had induced all the employés to go out, and was trying to keep them out, and that they threatened to return if the Big Four line was exempted from the tie-up.

What I have said of the credibility of Phelan in reference to his agency in enforcing the boycott and tie-up applies with equal force to nearly all his witnesses, especially to those from his city committee. They would have the court believe that Phelan was merely a peacemaker in this community, with no responsibility for the strike, and no purpose to incite it or continue it. Take Bateman. He was a switchman of the receiver, and on the subcommittee of the road. Debs had been applied to by the president of the stock yards to allow the cattle cars to be unloaded, and Debs—presumably in the exercise of the dispensing power given him by the constitution—had directed Phelan to have this done if no injury to the cause resulted. Pending this matter, Westcott was inquir-

ing into the outcome, and applied to Bateman as a subcommittee for information. Westcott says Bateman told him the stock matter was in Phelan's hands, and that the cattle could not be handled without Phelan's orders; that "whatever Phelan says, goes." Phelan told Westcott substantially the same thing, and a telegram from Phelan to Debs is in evidence, in which he says, "I am having stock unloaded." And yet Bateman denies his conversation with Westcott, and another member of the city committee says that Phelan had nothing to do with it, and only applauded when it was done. Every committee man who came upon the stand (and they made the majority of contemner's witnesses) tried to give the impression that they were not acting under Phelan's orders, and so does Phelan, and yet his complete command is so apparent that it cannot escape any one. When Phelan forgot himself he used such expressions as "my committee," "I instructed them to do so and so," and occasionally such telltale words would creep into the evidence of all his witnesses. Another kind of statement indulged in by Phelan and all of the committee was to the effect that these committees were organized solely for the purpose of keeping the peace, and assisting the sick, providing for parades, and hiring halls; but not one word is said about the efforts of the committee to induce men to leave the employ of the various railroads, and yet, if Phelan's injunction was followed, persuasion, explanation, and argument were to be used with all who did not join the cause at once. The committee and subcommittees were 75 in number. Phelan told Westcott at one time that he had to visit railroad yards with his committee; at another time that his committee were out visiting the various yards, to see the day crews. Evidently they were visiting the men who remained still at work, for the purpose of inducing them to quit; and this, though not mentioned by a single witness for the defense, was doubtless one of the chief reasons for their appointment.

With the intention of showing that he has been guilty of no interference with a compliance with the orders of this court, Phelan said upon the stand that he knew the Southern Railroad was operated by a receiver appointed by this court, and was therefore anxious to avoid interference with its operation, and prevented the calling out of the coach cleaners in the Ludlow yards on this account. Moreover, Buelte, of his city committee, testifies that the Cincinnati Southern was especially excepted from the operation of the boycott notice because it was in the hands of the court. And yet Tuesday night, in the preparation for the boycott and strike which was to be put into effect on Thursday following, through the action of committees in respect to which Phelan himself admits he made suggestions, and which were appointed under his supervising eye, a switchman from the receiver's yard was made the agent of the American Railway Union and its allies to notify the receiver's yard master of the boycott. The notice was given, and the strike occurred earlier among the receiver's employés than among those on some of the other roads. Phelan told Westcott on Thursday afternoon that the men were all out on the

Southern, and yet this was the road he wished to save from the boycott, because it was in the hands of the court. What did he visit Ludlow for on Friday, and address a meeting of railway employés, if he intended to be careful about interfering with the operation of the Southern Railroad by the court? There are no railway employés in Ludlow but those of the receiver. What was Bateman, the committee man, doing in that place in attendance at two other meetings, if the respect of Phelan and his committee for the court's orders was so great? The purpose with reference to the Southern, as with respect to every other road, is so clearly shown by the telegrams between Debs and Phelan, that it could hardly be more certain if Phelan had admitted it.

Debs to Phelan:

"June 27, 1894.

"Indications are that all western lines will be tied up solidly before sunset to-day."

Phelan to Debs:

"June 28, 1894.

"I cannot keep others out if Big Four is excepted. The rest are emphatic on all together or none. The tie-up is successful."

Debs to Phelan:

"June 29, 1894.

"About 25 lines now paralyzed. More following. Tremendous blockade."

Debs to Phelan:

"July 2, 1894.

"Knock it to them hard as possible. Keep Big Four out, and help get them out at other places."

Phelan to Debs:

"July 2, 1894.

"Going out all around. Firemen a unit. Will soon be an avalanche to us. Working outside points."

Debs to Phelan:

"July 2, 1894.

"Hold Big Four solid. Going out to-day at every point. Gaining ground rapidly."

Debs to Phelan:

"July 2, 1894.

"Advices from all points show our position strengthened. Baltimore and Ohio, Pan Handle, Big Four, Lake Shore, Erie, Grand Trunk, and Mich. Central are now in fight. Take measures to paralyze all those that enter Cincinnati. Not a wheel turning on Grand Trunk between here and Canadian line."

I have now gone over, more at length than necessary, perhaps, the evidence concerning Phelan's connection with the boycott and strike, his purpose in coming to Cincinnati, and what he did here, and I find the fact to be that he came here deputed by Debs, president of the American Railway Union, and its board of directors, to enforce a boycott against the cars of the Pullman Company by inciting all the employés of the railroads running into Cincinnati to leave their employ, and thereby to tie up every road, and

paralyze all traffic of every kind until all of the railroads should consent not to carry Pullman cars in their trains; and that his plan and his actions were directed as much against the Cincinnati Southern road in the hands of the receiver of this court as against every other road in the city; and that he knew, when he inaugurated the boycott on the Southern road and incited the receiver's employés to strike, that the road was in the hands of the receiver, and was being operated under the order of this court.

We come now to consider the question of fact whether Phelan in any of his speeches advised intimidation, threats, or violence in carrying out the boycott. He is charged with having said, on Thursday night, June 28th, at the meeting at West End Turner Hall, that the strike was then declared on; that it was the duty of every A. R. U. man to quit work, to induce and coax other men to go out, and, if this was not successful, to take a club, and knock them out. He is charged with having said, on the same or another occasion during the same week, that the committees should be appointed to persuade men to go out; that, if they would not go, then the committee should get round behind, and kick them out. The meetings at which these remarks were said to have been made were behind closed doors, and no newspaper reporters were permitted to be present. Only A. R. U. men and railroad employés made up the audience. The first charge is supported by the evidence of one J. O. Sweeney, a timekeeper of the Big Four Railway, and he is, so far as the evidence shows, a wholly disinterested witness; and by the evidence of one E. W. Dormer, a witness whose credibility I shall consider later. They both say that the remark elicited much applause, and that, shortly before or after, Phelan advised them to be law-abiding citizens. To this charge Phelan makes an explanatory answer as follows:

"I told nobody to take a club, and do anything with anybody. I, upon several occasions in this city, have used about that one expression about in the same line with that, the substance of which is about this: I have told the boys—different ones—there was a good deal of demands upon me to go around and see everybody and explain this Pullman trouble. I was worried to death. * * * I said, 'You constitute yourselves a committee of one, each of you, and go to the people,—the community in which you live,. Go to the boys,—I mean their acquaintances,—and explain to them this trouble. Talk to them about it. Beseech them to listen, because I want them to get the idea before they would condemn us about it; but do not take a club, and knock them in the head about it.' The peculiarity of the speech elicited applause, but I am afraid it was taken the other way."

With reference to the second charge, it is supported by the evidence of E. W. Dormer, who testifies he heard Phelan say it. An account of the speech in which it was said to have occurred was published in the Cincinnati Enquirer of June 29th, and read to Phelan by counsel for the receiver. It was as follows:

"Mr. Phelan addressed the men familiarly. 'He who is not with us in this struggle is against us, and will be so regarded.' Then he spoke in scathing tones of the Pullmans. 'We want no weak-kneed individuals with us; we want warriors.' Mr. Phelan then launched into an eloquent denunciation of Grand Master Arthur of the order of locomotive engineers. 'He has not the courage to declare a strike.' "

So far Phelan admitted the truth of the article. The article proceeded:

"When this strike is declared, as it will be before you go home to-night, the members of the American Railway Union in San Francisco, Oregon, Chicago, and all over the great west will stand by you to the bitter end."

As to this he said he did not recollect it, though he would not deny it. "It might have accidentally slipped out," he said. The article, after stating the passage of a resolution not to go back to work till the strike was declared off, which resolution Phelan said upon the stand that he never heard of, proceeded:

"Mr. Phelan then resumed: 'We must stand solidly together in this hour of trial, and, if anybody returns to work, or takes the place of strikers, seize them by the back of the neck, and throw them out.'"

Upon this passage the examination was as follows:

"Q. Did you say that? A. I don't recollect. Q. Will you swear to the court you did not say it? A. I don't recollect of saying it. Q. Will you swear you did not? A. I don't recollect of saying it. Q. That is as much as you will say? A. That is as much as I will say. I will state this, however, if you want any qualification on it. Q. I don't want any qualification. A. If I did say it, I meant to throw them out of the organization."

This was not a denial of the remark at all, but a statement that it meant something different from 'what it purported to mean. Phelan said several times in his examination that in a speech remarks slip out that one does not intend. Certainly, if he did not intend personal intimidation by this remark, it was an unfortunate one.

An attack is made on the credibility of Dormer. He was a detective in the employ of Field's Detective Agency of St. Louis, and in the employ of the receiver, ostensibly as a brakeman at first, and afterwards a striker, under the name of Williams. His character has not been attacked otherwise than by showing his assumption of a false appearance and name. There is evidence tending to show a willingness on his part to involve some of his fellow strikers in a trespass on the company's property, but I am bound to say that his accuracy as to everything else that occurred at the meetings which he attended has been borne out by the evidence of Phelan and his witnesses as far as they are willing to recollect. Were the charges as to Phelan's language dependent on Dormer's statement alone, I should not give them sufficient weight to overcome positive denials from Phelan; but the difficulty with Phelan's case is that he does not really and positively deny the statement of Dormer, but seeks to give the language another meaning, which it cannot bear. He contends in respect to each of the charges of inciting violence that his meaning was misunderstood. Had his evidence and that of his committee upon the main issues in this case not been most evasive and wanting in sincerity, I should still be inclined to give Phelan's explanations credit, and give him the benefit of a doubt on this point; but his whole case breaks down with the attempt of himself and his followers to conceal and pervert the most apparent fact in the case, namely, that he instigated, engineered, and con-

trolled the boycott and strike at Cincinnati from beginning to end. After this his denials and evasions can be given little weight. It is doubtless true that Phelan did tell his men to be law-abiding, that he did tell them to stay out of saloons, and off the company's property, in public, and that he did not wish his followers to subject themselves to the punishment of the law. Westcott testifies to this, and so do Dormer and Sweeney, and this has doubtless prevented many open assaults and trespasses. But I do not doubt that at the same time he encouraged in them a vicious and malicious disposition towards those of their fellows who did not join with them in this boycott, by expressions of the kind testified to by Sweeney and Dormer, and most evasively denied by Phelan, slyly slipped in where they could be given a double meaning if questioned.

The expressions were for the purpose of bringing into operation that secret terrorism which is so effective for discouraging new men from filling the strikers' places, and which is so hard to prove in a court of justice unless it results in open assault. That Phelan openly discouraged conflict with the law is to his credit as a strike organizer, for he wished public sympathy; but that he wished the aid of that secret terrorism, which is quite as unlawful, seems to me to be established. The town of Ludlow has been in such a state that the receiver's employés who live there have been in constant fear. Two engineers have left the town, and moved their families away. The receiver has boarded employés within guarded precincts. It has been shown that storekeepers of Ludlow have refused to sell goods to the receiver's employés because they were boycotted. Threats have been made, and an assault. Insulting and aggressive language has been used to receiver's employés on both sides of the river. Threats are hard to prove. If effective, they not only keep away the employés from service, but the witness from the stand. The receiver has been obliged to keep a large force of the United States deputy marshals on both sides of the river and on his engines and trains in order to induce his employés, new and old, to remain in his service. I cannot presume that such protection was invoked by the employés because of groundless fears. The question of fact whether Phelan used expressions in his speeches behind closed doors to the employés of the receiver which were calculated to induce intimidation is not of primary importance in this case, for, as will hereafter be seen, his interference with the operation of the Southern road by the instigation and maintenance of the boycott and strike against the road was the main contempt of this court. The suggestions leading to intimidations would only be aggravations of the contempt; that is all.

Section 725, Rev. St. U. S., provides that:

"The said courts [i. e. courts of the United States] shall have power to impose and administer all necessary oaths and to punish by fine or imprisonment at the discretion of the courts contempt of their authority: provided, that such power to punish contempts shall not be construed to extend to any cases except the misbehaviour of any person in their presence, or so near thereto as to obstruct the officers of said courts in their official transactions, and the

disobedience or resistance by any such officer, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the said courts."

It has been held by Judge Drummond in Secor v. Railroad Co., 7 Biss. 513, Fed. Cas. No. 12,605, that any unlawful interference with the operation of a road in the hands of a receiver is a contempt of the court, because it is a disobedience or resistance by a person to a lawful order of the court. This view has been taken by Judges Brewer and Treat in U. S. v. Kane, 23 Fed. 748; and in Re Doolittle, Id. 544; and by Judge Pardee in Re Higgins, 27 Fed. 443. These authorities show that any willful attempt by any one, with knowledge that the road is in the hands of the court, to prevent or impede the receiver from complying with the order of the court in running the road, when the attempt is unlawful, and as between private individuals, would give a right of action for damages, is a contempt of the order of the court. The rights of the receiver with reference to his business in conducting the railroad under order of the court are not different in any respect from those of a private railway corporation. The only difference is in the remedy which the courts will apply to prevent or to punish a violation of them when such a violation prevents or impedes the operation of the road, and is intended to do so.

There is no doubt that Phelan intended to prevent utterly the operation of the Southern road by calling out the receiver's employés. He wished thus to paralyze his business. He did the trust a very substantial injury by stopping all traffic for a time, by making it necessary for the receiver to pay heavy expenses for unusual police protection, and by putting him to much trouble and expense in securing new employés. Now, if the receiver were a private corporation, could he recover damages for the injury thus inflicted on the business of the road? A malicious or unlawful interference with the business of another by inducing his employés to leave his service is an actionable wrong, and subjects the offender to liability for the loss occasioned. In Walker v. Cronin, 107 Mass. 555, it was held that a count in a declaration which alleged that a plaintiff was a manufacturer of shoes, and for the prosecution of his business it was necessary for him to employ many shoemakers; that the defendants, well knowing this, did maliciously and without justifiable cause molest him in carrying on said business, with the unlawful purpose of preventing him from carrying it on, and willfully induced many shoemakers who were in his employment, and others who were about to enter it, to abandon it without his consent and against his will; and that thereby the plaintiff lost their services and profits and advantages, and was put to great expense to procure other suitable workmen, and was otherwise injured in his business,—stated a good cause of action. See, also, Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307.

The real question, therefore, is whether the act of Phelan in instigating and inciting the employés of the receiver to leave his employ was without lawful excuse, and therefore malicious. The question is not whether such an act would subject Phelan to punishment

by indictment and trial under the criminal laws, but whether the act was unlawful in the sense that he could be made to pay damages for the loss occasioned. Of course, if the act would subject him to punishment for an indictable misdemeanor and crime, a fortiori would the act be unlawful; but his act may be a contempt without being a crime.

Now, it may be conceded in the outset that the employés of the receiver had the right to organize into or to join a labor union which should take joint action as to their terms of employment. It is of benefit to them and to the public that laborers should unite in their common interest and for lawful purposes. They have labor to sell. If they stand together, they are often able, all of them, to command better prices for their labor than when dealing singly with rich employers, because the necessities of the single employé may compel him to accept any terms offered him. The accumulation of a fund for the support of those who feel that the wages offered are below market prices is one of the legitimate objects of such an organization. They have the right to appoint officers who shall advise them as to the course to be taken by them in their relations with their employer. They may unite with other unions. The officers they appoint, or any other person to whom they choose to listen, may advise them as to the proper course to be taken by them in regard to their employment, or, if they choose to repose such authority in any one, may order them, on pain of expulsion from their union, peaceably to leave the employ of their employer because any of the terms of their employment are unsatisfactory. It follows, therefore (to give an illustration which will be understood), that if Phelan had come to this city when the receiver reduced the wages of his employés by 10 per cent. and had urged a peaceable strike, and had succeeded in maintaining one, the loss to the business of the receiver would not be ground for recovering damages, and Phelan would not have been liable to contempt even if the strike much impeded the operation of the road under the order of the court. His action in giving the advice, or issuing an order based on unsatisfactory terms of employment, would have been entirely lawful. But his coming here, and his advice to the Southern Railway employés, or to the employés of other roads, to quit, had nothing to do with their terms of employment. They were not dissatisfied with their service or their pay. Phelan came to Cincinnati to carry out the purpose of a combination of men, and his act in inciting the employés of all Cincinnati roads to quit service was part of that combination. If the combination was unlawful, then every act in pursuance of it was unlawful, and his instigation of the strike would be an unlawful wrong done by him to every railway company in the city, for which they can recover damages, and for which, so far as his acts affected the Southern Railway, he is in contempt of this court.

Now, what was the combination and its legal character? Was it an unlawful conspiracy? I do not mean by this an indictable conspiracy, because that depends on the statute; but was it a conspiracy

at common law? If it was, then injury inflicted would be without legal justification, and malicious. A conspiracy is a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means. Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542. What were the purposes of this combination of Debs, Phelan, and the American Railway Union board of directors? They proposed to inflict pecuniary injury on Pullman by compelling the railway companies to give up using his cars, and, on the refusal of the railway companies to yield to compulsion, to inflict pecuniary injury on the railway companies by inciting their employés to quit their services, and thus paralyze their business. It could not have been unknown to the combiners that the Pullman cars were operated by the railway companies under contracts with Pullman. Such large transactions are never conducted without contracts saving the rights of both sides, and the combiners had every reason to believe that it would be a violation of those contracts for the companies to refuse further to haul Pullman cars in their trains. One purpose of the combination was to compel railway companies to injure Pullman by breaking their contracts with him. The receiver of this court is under contract to Pullman, which he would have to break were he to yield to the demand of Phelan and his associates. The breach of a contract is unlawful. A combination with that as its purpose is unlawful, and is a conspiracy. Angle v. Railway Co., 151 U. S. 1, 14 Sup. Ct. 240.

But the combination was unlawful without respect to the contract feature. It was a boycott. The employés of the railway companies had no grievance against their employers. Handling and hauling Pullman cars did not render their services any more burdensome. They had no complaint against the use of Pullman cars as cars. They came into no natural relation with Pullman in handling the cars. He paid them no wages. He did not regulate their hours, or in any way determine their services. Simply to injure him in his business, they were incited and encouraged to compel the railway companies to withdraw custom from him by threats of quitting their service, and actually quitting their service. This inflicted an injury on the companies that was very great, and it was unlawful, because it was without lawful excuse. All the employés had the right to quit their employment, but they had no right to combine to quit in order thereby to compel their employer to withdraw from a mutually profitable relation with a third person for the purpose of injuring that third person, when the relation thus sought to be broken had no effect whatever on the character or reward of their service. It is the motive for quitting, and the end sought thereby, that make the injury inflicted unlawful, and the combination by which it is effected, an unlawful conspiracy. The distinction between an ordinary lawful and peaceable strike entered upon to obtain concessions in the terms of the strikers' employment and a boycott is not a fanciful one, or one which needs the power of fine distinction to determine which is which. Every laboring man recognizes the one or the other as quick-.

ly as the lawyer or the judge. The combination under discussion was a boycott. It was so termed by Debs, Phelan, and all engaged in it. Boycotts, though unaccompanied by violence or intimidation, have been pronounced unlawful in every state of the United States where the question has arisen, unless it be in Minnesota; and they are held to be unlawful in England.

In Moores v. Bricklayers' Union, 23 Wkly. Cin. Law Bull. 48, a union which embraces 95 per cent. of the bricklayers of Cincinnati got into a controversy with Parker, a boss bricklayer, concerning apprentices and other matters. The union boycotted Parker, and notified all material men that any one selling him material would themselves be boycotted. Moores & Co. continued to sell Parker lime. Thereupon the union notified all of plaintiffs' customers and probable customers that none of its members would work Moores & Co.'s materials, and seriously damaged the business of Moores & Co. There was no violence, actual or threatened, in the case. Moores & Co. sued the Bricklayers' Union and some of its prominent members for the damages caused by the boycott. This case was tried before a jury in the superior court of Cincinnati, and resulted in a verdict for the plaintiffs of $2,500. The motion for new trial was reserved to the general term, where the case was fully considered, and the conclusion reached that the verdict must stand, because the combination to injure Moores & Co. was an unlawful conspiracy. The case was then carried by writ of error to the supreme court of Ohio, and the judgment of the superior court was affirmed, without opinion. By the common law of Ohio, therefore, boycotts are illegal conspiracies. I quote from the opinion of the superior court in that case two passages, which seem to me to state the ground for holding boycotts illegal:

"We are dealing in this case with common rights. Every man, be he capitalist, merchant, employer, laborer, or professional man, is entitled to invest his capital, to carry on his business, to bestow his labor, or to exercise his calling, if within the law, according to his pleasure. Generally speaking, if, in the exercise of such a right by one, another suffers a loss, he has no ground of action. Thus, if two merchants are in the same business in the same place, and the business of the one is injured by the competition, the loss is caused by the other's pursuing his lawful right to carry on business as seems best to him. In this legitimate clash of common rights the loss which is suffered is damnum absque injuria. So it may reduce the employer's profits that his workmen will not work at former prices, and that he is obliged to pay on a higher scale of wages. The loss which he sustains, if it can be called such, arises merely from the exercise of the workman's lawful right to work for such wages as he chooses, and to get as high rate as he can. It is caused by the workman, but it gives no right of action. Again, if a workman is called upon to work with the material of a certain dealer, and it is of such a character as either to make his labor greater than that sold by another, or is hurtful to the person using it, or for any other reason is not satisfactory to the workman, he may lawfully notify his employers of his objection, and refuse to work it. The loss of the material man in his sales caused by such action of the workman is not a legal injury, and not the subject of action. And so it may be said that in these respects what one workman may do, many may do, and many may combine to do without giving the sufferer any right of action against those who cause his loss. But on this common ground of common rights, where every one is lawfully struggling for the

mastery, and where losses suffered must be borne, there are losses willfully caused to one by another in the exercise of what otherwise would be a lawful right, from simple motives of malice.

　·　*　*　*　*　*　*　*　*　*　*　*　*

"The normal operation of competition in trade is the keeping away or getting away patronage from rivals by inducements offered to the trading public. The normal operation of the right to labor is the securing of better terms by refusing to contract to labor except on such terms. * * * If the workmen of an employer refuse to work for him except on better terms, at a time when their withdrawal will cause great loss to him, and they intentionally inflict such loss to coerce him to come to their terms, they are bona fide exercising their lawful rights to dispose of their labor for the purpose of lawful gain. But the dealings between Parker Bros. and their material men, or between such material men and their customers, had not the remotest natural connection either with defendants' wages or their other terms of employment. There was no competition or possible contractual relation between plaintiffs and defendants where their interests were naturally opposed. The right of the plaintiffs to sell their material was not one which, in its exercise, brought them into legitimate conflict with the rights of defendants to dispose of their labor as they chose. The conflict was brought about by the effort of defendants to use plaintiffs' right of trade to injure Parker Bros., and, upon failure of this, to use plaintiffs' customers' right of trade to injure plaintiffs. Such effort cannot be in the bona fide exercise of trade, is without just cause, and is, therefore, malicious. The immediate motive of defendants here was to show to the building world what punishment and disaster necessarily followed a defiance of their demands. The remote motive of wishing to better their condition by the power so acquired will not, as we think we have shown, make any legal justification for defendants' acts."

And so here there was no natural relation between Pullman and the railway employés, and their attempt to injure the companies because they would not injure him is without cause, and malicious, and is unlawful, even though the injury is inflicted merely by quitting employment.

Temperton v. Russell (1893) 1 Q. B. 715, was a case quite like the case just cited. There a firm of builders refused to obey certain rules laid down by three trades unions connected with the building trade at Hull. Thereupon a joint committee of the unions boycotted the building firm; that is, they attempted to prevent it from procuring any materials by notifying material men not to furnish them, on pain of being themselves boycotted. The plaintiff, a material man, refused to comply with its demand, and the unions then demanded of his material men not to furnish him any material, with the threat that, if they did so, their workmen would quit. The result of this was that contracts for supplies to the plaintiff were broken, and others who, but for the threats, would have made contracts, were deterred from doing so. It was held that the boycott was an unlawful conspiracy, and that the joint committee of the unions who were sued were liable in damages for a malicious interference with the plaintiff's business. There was no violence or threatened violence in this case. The case was decided by the court of appeal of England, consisting of Lord Ester, master of rolls, and Lopes and A. L. Smith, lord justices.

In Carew v. Rutherford, 106 Mass. 1, a contracting stone mason, contrary to the rules of the union, sent some of his material out of the state to be dressed, and his men, members of the union, re-

fused to work for him any longer unless he paid a fine to the union, and did not return until he paid the fine. This was held to be illegal conspiracy for the purpose of extortion and mischief, and the employer was given a judgment for the recovery of the fine and damages.

Boycotts have been declared illegal conspiracies in State v. Glidden, 55 Conn. 46, 8 Atl. 890; in State v. Stewart, 59 Vt. 273, 9 Atl. 559; Steamship Co. v. McKenna, 30 Fed. 48; Casey v. Typographical Union, 45 Fed. 135; Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 730, 738; and in other cases.

But the illegal character of this combination with Debs at its head and Phelan as an associate does not depend alone on the general law of boycotts. The gigantic character of the conspiracy of the American Railway Union staggers the imagination. The railroads have become as necessary to life and health and comfort of the people of this country as are the arteries on the human body, and yet Debs and Phelan and their associates proposed, by inciting the employés of all the railways in the country to suddenly quit their service without any dissatisfaction with the terms of their own employment, to paralyze utterly all the traffic by which the people live, and in this way to compel Pullman, for whose acts neither the public nor the railway companies are in the slightest degree responsible, and over whose acts they can lawfully exercise no control, to pay more wages to his employés. The merits of the controversy between Pullman and his employés have no bearing whatever on the legality of the combination effected through the American Railway Union. The purpose, shortly stated, was to starve the railroad companies and the public into compelling Pullman to do something which they had no lawful right to compel him to do. Certainly the starvation of a nation cannot be a lawful purpose of a combination, and it is utterly immaterial whether the purpose is effected by means usually lawful or otherwise.

More that this, the combination is in the teeth of the act of July 2, 1890, which provides that:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or both said punishments, in the discretion of the court."

That such a combination as the one under discussion is within the statute just quoted has been decided by Judge Billings of Louisiana in U. S. v. Workingmen's Amalgamated Council of New Orleans, 54 Fed. 994. His view has been followed by the circuit judges of this circuit within the past 10 days, by Judges Woods, Allen, and Grosscup of the seventh circuit, and by Judge Woolson of the eighth circuit. A different view has been taken by Judge Putnam in U. S. v. Patterson, 55 Fed. 605, but, after consideration, Judge Lurton and I cannot concur with the reasoning of that learned

judge. The fact that it was the purpose of Debs, Phelan, and their associates to paralyze the interstate commerce of this country is shown conclusively in this case, and is known of all men. Therefore their combination was for an unlawful purpose, and is a conspiracy, within the statute cited.

It could also be shown, if it were necessary, that this combination was an unlawful conspiracy because its members intended to stop all mail trains as well as other trains, and did delay and retard many, in violation of section 3995, Rev. St. U. S., which imposes a penalty on any one willfully and knowingly obstructing or retarding the passage of the mail. It would be no defense, under that statute, that the obstruction was effected by merely quitting employment, where the motive of quitting was to retard the mails, and had nothing to do with the terms of employment.

Something has been said about the right of assembly and free speech secured by the constitution of Ohio. It would be strange, indeed, if that right could be used to sustain the carrying out of such an unlawful and criminal conspiracy as we have seen this to be. It never has been supposed to protect one from prosecution or suits for slander, or for any of the many malicious and tortious injuries which the agency of the tongue has been so often employed to inflict. If the obstruction to the operation of the road by the receiver was unlawful and malicious, it is not less a contempt because the instrument which he used to effect it was his tongue, rather than his hand.

But it is unnecessary to consider the question further. It is very clear that Phelan came here to carry out an illegal conspiracy, in the course of which, and in pursuance of which, he attempted, and partially succeeded in tying up the Southern Railroad, operated by a receiver under an order of this court, as he well knew. His purpose in calling out the employés of the Southern Railroad was unlawful by the law of Ohio, and the laws of the United States. He intended to prevent entirely its operation. He partially succeeded, and he subjected the receiver to great expense in reducing the loss occasioned by his acts.

It follows that the contemnor is guilty as charged, and it only remains to impose the sentence of the court. This is in the discretion of the court, to be exercised on any information in reference to the convicted person which the court believes to be reliable. The court would be much more disposed to leniency in this case if the contemnor, after his arrest, had shown the slightest regard for the order of the court which the receiver was attempting to comply with in the operation of the road. Even if he did not fully realize the position in which he had put himself with respect to the order of the court to the receiver to operate the Southern Railroad, his arrest, and the service of the intervening petition, together with the restraining order, should have quickened his conscience and his perceptions of his duty in this regard. It was his duty, therefore, to cease all his operations with reference to the strike in this city which could in any way affect the operation of the Southern Railway, whether by inciting employés to leave the receiver or by preventing

his employment of others.    What did he do?    Instead of ceasing to incite the receiver's employés to leave his employ in pursuance of his unlawful conspiracy, there has been no change whatever in his course from that pursued by him before his arrest. By speeches every night since the arrest he has aggravated his contempt.    On the night of July 4th, it is in evidence, the contemnor said, in a speech to railroad employés of the city, referring to this trial:

"I don't care if I am violating injunctions.  No matter what the result may be to-morrow, if I go to jail for sixteen generations, I want you to do as you have done:  Stand pat to a man.  No man go back unless all go, and all stay out unless Phelan says go back."

It was a direct invitation to continue the course already taken under his direction of preventing the return of employés to the receiver, and of persuading the striking of others, and an avowed intention of disregarding the order of the court.

The punishment for a contempt is the most disagreeable duty a court has to perform, but it is one from which the court cannot shrink.    If orders of the court are not obeyed, the next step is unto anarchy.    It is absolutely essential to the administration of justice that courts should have the power to punish contempts, and that they should use it when the enforcement of their orders is flagrantly defied.    But it is only to secure present and future compliance with its orders that the power is given, and not to impose punishment commensurate with crimes or misdemeanors committed in the course of the contempt, which are cognizable in a different tribunal or in this court by indictment and trial by jury.    I have no right, and do not wish, to punish the contemner for the havoc which he and his associates have wrought to the business of this country, and the injuries they have done to labor and capital alike, or for the privations and sufferings to which they have subjected innocent people, even if they may not be amenable to the criminal laws therefor.    I can only inflict a penalty which may have some effect to secure future compliance with the orders of this court and to prevent willful and unlawful obstructions thereof.

After much consideration, I do not think I should be doing my duty as a judicial officer of the United States without imposing upon the contemner the penalty of imprisonment.    The sentence of the court is that Frank W. Phelan be confined in the county jail of Warren county, Ohio, for a term of six months.    The marshal will take the prisoner into custody, and safely convey him to the place of imprisonment.