## MEIER v. SPEER.

Opinion delivered December 5, 1910.

1. CONSPIRACY—DEFINITION OF "BOYCOTT."—A "boycott" is a combination to cause a loss to one person by coercing others against their will to withdraw from him their beneficial business intercourse by threats

that, unless those others do so, the combination will cause similar loss to them, or by the use of such means as will inflict bodily harm on them, or such intimidation as will put them in fear of bodily harm. (Page 624.)

2. SAME—AGREEMENT AS TO TERMS OF WORK.—In the absence of a contract, and where no public duty forbids, workmen may agree upon the terms on which they will work for others, and may refuse to work if such terms are not accepted. (Page 625.)

3. SAME—BOYCOTT.—An agreement between the members of a labor union not to work for a particular person nor to work on a particular building if he has any contract to do work thereon is not unlawful. (Page 625.)

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; reversed and dismissed.

### STATEMENT BY THE COURT.

John Carbaugh, who lived in Fort Smith, Arkansas, was a contractor, and engaged in the building of houses. He also was engaged in the manufacture and sale of brick. The Fort Smith Biscuit Company had instructed its president to let a contract to Carbaugh for the building of its factory and two ovens. Carbaugh was unable to procure one O'Neal, a stone contractor, to lay the foundation of the building. O'Neal refused to take the contract to lay the foundation for the reason that the masons in his employ, among whom were appellants Meier and McCauley, would not do the work if Carbaugh was to erect the superstructure. If Carbaugh had succeeded in erecting this factory, he would have made a profit of about $2,500. A contractor by the name of Zimmerman, who employed only union labor, had the contract for the construction of certain brick buildings for the Fort Smith Supply & Construction Company. He would have purchased the brick for these buildings from Carbaugh, but his foreman, Glenn, a member of the union, told him that the union brick layers would not work them, and he could not afford, therefore, to purchase them from Carbaugh. Had Carbaugh succeeded in selling the brick for these buildings to Zimmerman, he would have made a profit on them of at least $500.

Appellant Meier was the president of the Stone Masons' Union No. 14, and appellant McCauley was its secretary. James Riddick was secretary of the Brick Layers' Union No. 8. A rule

of these unions required their members to work only for those who employed union labor and on jobs where only union labor was employed. A breach of this rule by a member subjected him to a fine or suspension; the one or the other was imposed, depending upon the gravity of the offense. No official boycott was declared by these unions against Carbaugh. It was attempted, but was "ruled out of order, and no attention paid to it at all."

To use the terminology of the unions, "fair" work means when the contractor, who is having the work done, employs only union mechanics, to the exclusion of all other mechanics, on the work. Carbaugh was considered by appellants as "unfair" because he employed nonunion laborers and refused to employ union labor only. For that reason appellants refused to work on buildings that he had the contract to build. When Meier, at the request of O'Neal, met with the president of the Biscuit Company and the architect for the purpose of telling them the reason why the stone masons would not put in the foundation, it was shown that, in explanation of the attitude of himself and the other members of the stone masons' union, Meier said: "Carbaugh is the man we are after." But the testimony further shows that he said, in the course of the same conversation, that "he mentioned Carbaugh because he was the only man in town that was employing nonunion workmen." The testimony, as a whole, shows conclusively that Meier had no personal illwill or animosity against Carbaugh. Nor did any of the other appellants. Their sole reason for refusing to lay the foundation for their employer, O'Neal, on a building the superstructure of which was to be erected by Carbaugh was that Carbaugh employed to do his work nonunion labor and would not employ union labor exclusively.

Carbaugh alleged in his complaint against appellants "that they and others with whom they are associated and the unions have wrongfully, maliciously and wilfully conspired together and connived with each other and with the unions to which they belong to cripple and destroy" his brick manufacturing business and his business as a builder and contractor. He alleged that, in pursuance of such conspiracy, appellants had boycotted the use of his brick, and had refused to use them in any building upon

which either they or their associates might be employed, and had refused to work upon any building or its foundation where plaintiff's brick were to be used or for the building and erection of which plaintiff had the contract. The complaint alleges that the loss to Carbaugh of the contract to build the factory for the Fort Smith Biscuit Company and the loss of the sale of the brick to the Fort Smith Supply and Construction Company, mentioned above, was a direct and proximate result of the unlawful conspiracy and boycott instituted by appellants to destroy Carbaugh's business. It concludes with a prayer for damages in the sum of $3,000.

The answer denied all the material allegations. The above is a condensed statement of the pleadings and the facts upon which the cause was submitted to the jury. The appellants prayed for an instruction directing a verdict in their favor, which was refused. A verdict was returned in favor of Carbaugh in the sum of $2,233. Judgment was rendered against appellants for that sum, and they have duly prosecuted an appeal to this court. Carbaugh has since died, and the action was revived in the name of his administrator, Speer. Other facts stated in opinion.

*Mechem & Mechem,* for appellants.

The court should have directed a verdict for the appellants. The evidence utterly fails to bring appellants under any legal liability to appellee. The manifest, declared and undeniable purpose of appellants, acting through their unions, as appears by the evidence, was to advance their own interests, which was lawful, and their acts were but the lawful exercise of personal rights to control their own labor. 26 Cyc. 819; 4 Metc. 111; 106 Mass. 14; 19 R. I. 255; 54 Minn. 223; 170 N. Y. 315; 136 N. C. 633; 49 S. E. 177; 24 Pa. 308; 169 Fed. 263; 98 Pac. 1027.

*Winchester & Martin,* for appellee.

The peremptory instruction was rightfully refused. The evidence clearly discloses a conspiracy on the part of appellants, acting through their unions, to inflict injury upon the appellee in his business. The individual acts may not in themselves be unlawful or hurtful and forbidden by law, but, when put together into a plan or conspiracy to injure, the parts as well as the plan becomes unlawful. 196 U. S. 395; 49 Law. Ed. 523; 195 U. S.

194; 49 Law. Ed. 154; 208 U. S. 496; 52 Law. Ed. 294; 175 U. S. 211; 44 Law. Ed. 136; 23 L. R. A. 588; 64 Mich. 252; 80 Tex. 400; 106 N. Y. 669; 176 Ill. 608; 43 L. R. A. 800; L. R. 15 Q. B. Div. 476; L. R. 6 Q. B. Div. 333; 98 Pac. 1027; 193 U. S. 38; 48 Law. Ed. 608; 48 L. R. A. 90, and authorities cited; 38 L. R. A. 197; 43 L. R. A. 803; 83 Fed. 912; 47 La. 214; 27 L. R. A. 416.

WOOD, J. (after stating the facts). The court should have directed a verdict in favor of appellants. We do not discover any evidence in the record of a conspiracy upon their part to injure the business of Carbaugh. No attempt was made by them, either individually or collectively, to dissuade O'Neal, for whom they were working, from entering into the contract with Carbaugh to lay the foundation of the Fort Smith Biscuit Company's factory. Nor does the evidence show any effort upon the part of these appellants to prevent Zimmerman from buying brick from Carbaugh. Certainly there is no evidence in this record that these appellants, severally or in combination, used any violence, or any threats, intimidation or coercion of any character, whereby to prevent Carbaugh from securing the contract to build the factory for the Fort Smith Biscuit Company, nor from securing the contract for the sale of brick to Zimmerman for the Fort Smith Supply & Construction Company. Giving the evidence its strongest probative force in favor of appellee, it only warrants the conclusion that appellants had agreed among themselves, as members of union labor organizations, that they would not work for Carbaugh because he was on what they term the "unfair list," that is he employed nonunion men when he could get union men for the same work.

There is no evidence that the union labor organizations took any official action towards "boycotting" Carbaugh because of his attitude towards union labor. On the contrary, the evidence is that such action was "attempted but ruled out of order." There is no evidence of any conspiracy or confederation among appellants to injure Carbaugh's business by boycotting him, i. e., by threatening injury to the trade, business or occupation of those who might have or who intended to have business relations with him. True, O'Neal testified that but for the "interference of the stone masons' union and some of its members, Meier and Mc-Cauley, "he would have put in the foundation for John Car-

baugh," but he further testified to the facts which, in his mind, constituted the interference, which were that Meier and Mc-Cauley said, when he asked them about it, that they and the members of the stone masons' union would not work for him in laying the foundation of the biscuit company factory if Carbaugh should have the contract to build the superstructure. He testified that these men had been in his employ twelve or fifteen years, that he did not wish to change his men with the job, "that it would have put him in bad standing, and that he would have been in the same place Carbaugh is, had he done so. But the conclusion of the witness O'Neal as to what might have been his standing with union labor and what might have been the effect upon his business, had he accepted the contract and laid the foundation for Carbaugh with other than union labor, is not based upon any evidence in this record showing that appellants by any word or act on their part threatened him with any such consequences as he says he apprehended.

The language employed by them certainly contained no element of intimidation or coercion, and the evidence does not disclose that in the manner of its use appellants intended that it should have the effect to intimidate or coerce O'Neal into refusing to take the contract from Carbaugh. O'Neal's apprehensions, therefore, so far as the evidence shows, were groundless.

There is no evidence that appellants endeavored to coerce O'Neal in any way. They made no threats whatever against his business. They did not even say that they would abandon his employment in the future if he took the contract to lay the foundation for Carbaugh. All they did was simply to tell him, upon his own inquiry and at a meeting held at his instance, that they would not work for him in laying the stone foundation if Carbaugh got the contract to do the brick work on the superstructure.

There is no testimony that the conduct of appellants, either individually or in concert, caused Zimmerman to refuse to buy brick from Carbaugh to build the houses for the Fort Smith Supply & Construction Company.

The fact that Glenn, who was a member of the brick masons' union, told Zimmerman that the brick layers' union would not use Carbaugh's brick, and that Zimmerman would not buy the

brick of Carbaugh because of what Glenn said, does not connect appellants in any manner with that transaction. It is not shown that Glenn was authorized to speak for appellants, and they were therefore not responsible for what he said. After a careful analysis of the evidence, our opinion is that the only reasonable conclusion to be drawn from it is that appellants agreed among themselves that they would not do any work for Carbaugh because "he was on what they termed the unfair list, that is, he employed nonunion men when he could get union men" to do the same work, and because he refused to employ union men to the exclusion of all others; that the reason appellants had this understanding among themselves was because they were members of labor unions, one of the rules of which required its members, under a penalty, to work for only those who employed exclusively union labor; that appellants joined the union and adhered to the rule in the instant case primarily for the protection of their own interest, and not for the purpose of injuring Carbaugh, except as he might be injured incidentally by adherence to the rule which was made solely for the benefit and protection of the members of the union to which appellants belonged; that appellants had no ill will against Carbaugh, and refused to work for him or his intended subcontractor solely because of his (Carbaugh's) attitude toward union labor; that appellants in their refusal to work for Carbaugh, or one whom he might employ, used no intimidation or coercion of any character in order to dissuade others from working for or patronizing him.

The principles of law applicable to the above facts are few, simple and well established. Mr. Martin in his recent work on the Modern Law of Labor Unions, at page 103, § 67, gives a correct definition of boycott as follows: "A combination to cause a loss to one person by coercing others against their will to withdraw from him their beneficial business intercource by threats that, unless those others do so, the combination will cause similar loss to them, or by the use of such means as will inflict bodily harm on them, or such intimidation as will put them in fear of bodily harm." He further says, same page, § 69: "Intimidation and coercion are essential elements of a boycott. It must appear that the means used are threatening and intended

to overcome the will of others and compel them to do or refrain from doing that which they would or would not otherwise have done." Citing many cases in note. While violence or the threats thereof frequently accompany a boycott, yet it is not essential that physical force, or the threat thereof, be present in order to constitute a boycott. But the things done or the words spoken must be "intended and naturally tend to overcome the will of others," and to induce them to do or not to do the things which those in the combination desire. Martin on the Modern Law of Labor Unions, p. 104, § 69, and cases cited.

As we have stated, there is nothing in the conduct of appellants toward O'Neal that would constitute a boycott by them against Carbaugh. It was not proved that they were under any contract with O'Neal for a definite time to do stone mason work for any whom he might designate. In the absence of a contract, appellants had the absolute right, no public duty forbidding, to prescribe the terms upon which they would work for Carbaugh, O'Neal or any one else. They had the right to refuse to work unless these terms were accepted and contractual relations were thereby created. This appellants had the right to do, severally or in combination, in the union or out of it. So long as appellants, either individually or collectively through their labor unions, directed their efforts solely to the control of their own labor and to formulating plans for bettering its condition, and to prescribing the terms upon which it might be had that would not interfere illegally with the rights of others, they were within the bounds of the law. For the right of every man in this country to dispose of his own labor as he chooses, so long as he does not contravene any duty to the public nor interfere with the legal rights of others, is both fundamental and axiomatic. What appellants could lawfully do acting singly; they could lawfully do conjointly, each and all having a like interest to conserve and promote. The Supreme Court of Massachusetts, speaking along this line, said:

"Every man has a right to determine what branch of business he will pursue, and to make his own contracts with whom he pleases and on the best terms he can. He may change from one occupation to another, and pursue as many different occupations as he pleases, and competition in business is lawful. He may refuse to deal with any man or class of men. And it is not

a crime for any number of persons, with a lawful object in view, to associate themselves together and agree that they will not work for or deal with a certain man or classes of men, or work under a certain price, or with certain conditions." *Carew* v. *Rutherford,* 106 Mass. 1. And the Supreme Court of Rhode Island in *MacCauley* v. *Tierney,* 19 R. I. 255, says:

"It was perfectly competent for the members of the association, in the legitimate exercise of their own business, to bestow their patronage on whomsoever they · chose and to annex any condition to the bestowal which they saw fit." And further: "What a person may lawfully do, a number of persons may unite with him in doing, without rendering themselves liable to the charge of conspiracy, provided the means employed be not unlawful." See also to the same effect the opinion of Chief Justice Parker speaking for the court in *National Protective Association* v. *Cumming,* 170 N. Y. 315, and of Judge Mitchell for the court in *Bohn Mfg. Co.* v. *Hollis,* 54 Minn, 223; *Commonwealth* v. *Hunt,* 4 Met. 111.

Hence labor unions are held by the courts generally to be lawful. As is said in 24 Cyc. 819: "Legislatures as well as the courts now recognize the right of laboring people to organize for the purpose of promoting their common welfare, elevating their standard of skill, advancing and maintaining their wages, fixing the hours of labor, and the rate of wages, obtaining employment for their members, securing control of the work connected with their trade, or favorable terms to their employers in the purchase of material and contracts for such persons as employ the members of their society."

The efforts of labor unions by any lawful means to attain these legitimate and commendable objects will not make them or their members liable in damages to those who may be directly or indirectly injured by such efforts. For, the purpose and the means used to obtain it both being lawful, there could not be any conspiracy or boycott. And, if any injury resulted to any one, it would be merely incidental and *damnum absque injuria.* The conservation of the chief asset of the laboring man, namely, his labor, through combination with his fellows and by their organized efforts is to be commended rather than condemned. For in that way his well being may be best promoted and the interest of society thereby advanced. As observed by Judge

Taft in *Thomas* v. *Cincinnati, N. O. & T. Ry Co.,* 62 Fed. 803, p. 817: "It is of benefit to them and the public that laborers should unite. They have labor to sell. If they stand together, they are often able, all of them, to command better prices for their labor than when dealing singly with rich employers, because the necessities of the single employee may compel him to accept any terms offered." As to how far the members of labor organization may go in their efforts to protect and promote their own interests without illegally interfering with the rights and interests of those who are not members of their unions is a question, of late years, under modern conditions of society and government, that has been frequently before the courts of last resort. The decisions of these courts disclose a wide diver-gence of opinion. We need not enter this realm of controversy to determine which is correct of the different views that have been expressed by courts and individual judges. Every case must rest upon its own facts, and we are of the opinion that, under the peculiar facts presented by this record, the conduct of appellants could not be held to be a conspiracy or a boycott to injure Carbaugh under any of the divergent views expressed by any of the courts or judges. Certain it is that the doctrine of the cases cited from which we have quoted *supra,* and other cases (all to be found in appellants' brief), shows most convincingly that the plaintiff Carbaugh had no cause of action against appellants. See especially *National Fireproofing Co.* v. *Mason Builders' Assn.,* 169 Fed. 263, and *J. F. Parkinson Co.* v. *Building Trades Council,* 98 Pac. 1027.

The judgment is therefore reversed, and the cause is dismissed.

Kirby, J., not participating.