## WABASH R. CO. v. HANNAHAN et al.

(Circuit Court, E. D. Missouri, E. D. April 1, 1903.)

1. INJUNCTION—CONSPIRACY IN RESTRAINT OF INTERSTATE COMMERCE—TEMPORARY RESTRAINING ORDER.

A bill filed by a railroad company against the officers of certain labor organizations alleged a malicious conspiracy on the part of defendants to interfere with the carrying of the mails by complainant, and to restrain interstate commerce, by inducing and compelling complainants' employés engaged in operating its trains, some of whom were members of such organizations, to strike in violation of their contracts, although they had no grievance and were entirely satisfied with their wages and conditions of service, and to prevent connecting carriers from interchanging traffic with complainant, the purpose being to compel complainant to recognize the organizations represented by defendants, and to employ no men who were not members thereof. *Held*, that such bill was sufficient to authorize and require a federal court to grant a temporary restraining order enjoining defendants from ordering or causing a strike of complainant's employés, or in any manner interfering with complainant in the discharge of its duties as a common carrier of interstate traffic and the mails, until a hearing could be had on a motion for a preliminary injunction.

2. LABOR STRIKES—RIGHT OF COMBINATION.

An employé has an unquestionable right to place a price and impose conditions upon his labor at the outset of his employment, or, unless restrained by contract obligations, upon the continuance of his labor at any time thereafter, and, if the terms and conditions are not complied with by the employer, he has a clear right not to engage, or having engaged in the service to cease from work, and what one may do all may lawfully combine to do for the purpose of rendering their action more effective. But this right of combination and to strike or quit the employment must be exercised in a peaceable and lawful manner, without violence or destruction of property or other coercive measures intended to prevent the employer from securing other employés, or otherwise carrying on his business according to his own judgment.

3. SAME—LABOR ORGANIZATIONS—DELEGATION OF POWERS TO OFFICERS OR COMMITTEES.

It is the right of labor to organize for lawful purposes, and by organic agreement to subject the individual members to rules, regulations, and conduct prescribed by the majority; and the courts cannot enjoin the officers or committees of such an organization from counseling or ordering a strike in the exercise of authority given them by the laws and sanctioned by a majority of its members, nor can such action be made the basis of a charge of malicious conspiracy.

4. SAME—LEGALITY OF ACTION—EVIDENCE CONSIDERED.

Evidence considered on a motion for a preliminary injunction, and *held* insufficient to sustain the charge of conspiracy to interfere with interstate commerce or prevent the carrying of the mails by complainant, in violation of the laws of the United States, or to support the allegations of the bill that defendants, as officers of the Brotherhood of Railway Trainmen and of the Brotherhood of Locomotive Firemen, respectively, in declaring their purpose to order a strike of the members of such orders in complainant's employ, acted without due authority from the employés affected, or with any purpose other than to enforce, by peaceable and lawful methods, demands previously made relating to wages and rules of work.

In Equity. On motion for preliminary injunction.

Wells H. Blodgett, C. N. Travous, and Boyle, Priest & Lehmann, for complainant.

F. A. Judson, E. J. Pinney, J. H. Murphy, and W. T. Irwin, for defendants.

ADAMS, District Judge. This is a suit commenced by the railroad company against John J. Hannahan, grand master of the Brotherhood of Locomotive Firemen, W. G. Lee, vice grand master of the Brotherhood of Railroad Trainmen, and officers and members of the joint protective board of the first-mentioned and of the general grievance committee of the second-named order.

The bill of complaint charges that the labor organizations above named, and the defendants, as officers, representatives, and agents of such organizations, "have unlawfully and maliciously conspired, combined, and confederated together for the purpose of forcing your orator to recognize said organizations as representing and controlling said employés in all their relations with your orator, and compelling its said lines of railroad within the United States to become and be operated as exclusively union or brotherhood roads, and thus prevent your orator, through its officers and agents, from dealing with its employés in respect to any difference or controversy between it and such employés, and from adjusting any such difference or controversy directly with its employés, as heretofore, and compelling your orator to discharge and discriminate against and keep out of its employ all persons not members of such organizations, and retain and employ in its service only such persons as are members of said organizations." Such is the purpose of the alleged conspiracy.

The means which the defendants are alleged in the bill of complaint to have devised and adopted to accomplish their purpose are as follows: (1) To maliciously induce and compel complainant's employés engaged in the operation of its trains as brakemen, switchmen, and locomotive engineers, who the bill alleges "are entirely satisfied as to all matters concerning their service and compensation," to quit the service of complainant, and that, too, in violation of their different contracts of employment; (2) to maliciously interfere with and prevent complainant from operating its trains and performing its contracts with shippers for the transportation of property; (3) to maliciously prevent complainant "from affording reasonable, proper, and equal facilities for the interchange of traffic between its lines of railroad and other lines of railroad connecting therewith, and from receiving, forwarding, and delivery of passengers and property to and from its lines of railroad with other railroads connecting with such lines, and making a continuous carriage of freight from the place of shipment to place of destination"; (4) to maliciously prevent connecting lines and their employés "from interchanging traffic with and affording like facilities to your orator, as required by the interstate commerce act"; (5) to maliciously prevent complainant from carrying the United States mail in accordance with its contracts in that regard, and as required by the statutes of the United States; (6) to maliciously obstruct complainant in the discharge of its duties as common carrier of interstate commerce, and to restrain and interfere with the commerce of the country, in violation both of the interstate commerce act (24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]),

and the act of July 2, 1890 (26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), "to protect trade and commerce against unlawful restraints and monopolies."

The bill of complaint further shows that the defendants, in order to accomplish their purpose, had threatened and were about to exercise the power and authority conferred upon them as officers, agents, and representatives of their brotherhoods to order and cause complainant's employés to forthwith strike and quit its service, and to incite and induce the employés of connecting lines to refuse to interchange traffic with complainant or to afford facilities therefor, and it is averred that unless an immediate restraining order be issued the threats and purpose aforesaid would be speedily executed, and irreparable injury done to complainant.

From the foregoing analysis of the bill of complaint it is observed that the jurisdiction of this court is invoked to prevent the execution of a conspiracy to accomplish the purpose of the defendants to secure recognition of their labor organizations, by violating and inducing others to violate the laws of the United States, in relation to interstate commerce, the mail service, and unlawful restraints and combinations. The threats of the defendants to subserve their own purposes by precipitating a strike on the part of complainant's employés, who, as already stated, are alleged to have been entirely satisfied with their present wages and conditions of service, is averred in the bill of complaint to be the initial act leading up to the culmination of the gist of the complaint, namely, preventing complainant from performing its duties and obligations, and thereby subjecting it to the pains and penalties of the interstate commerce and other acts of congress.

Upon the filing of this bill, duly verified, and upon motion of the complainant, a restraining order was forthwith made and served on the defendants, commanding them to refrain from ordering or causing a strike of complainant's employés, and from in any other way or manner interfering with complainant in the discharge of its duties as common carrier of interstate traffic and the mails of the United States, until the further order of this court, and the defendants were given 15 days within which to appear and show cause why the restraining order should be dissolved or modified.

Such an order, on the showing made by the bill of complaint, was not only warranted, but imperatively required, by well-recognized principles of equitable jurisprudence, as well as by controlling, satisfactory, and abundant authority in cases of similar character in this country and in England. On this point it will suffice to refer to the leading cases in this country of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310, 25 L. R. A. 414, in which Mr. Justice Harlan of the Supreme Court of the United States, sitting in the Court of Appeals for the Seventh Circuit, delivered the opinion of the court; and Toledo Railway Co. v. Pennsylvania Company (C. C.) 54 Fed. 730, 19 L. R. A. 387, and Thomas v. Cincinnati, N. O. & T. P. Ry. Co. (C. C.) 62 Fed. 803, in both of which Circuit Judge Taft delivered the opinion, and to the numerous cases therein referred to. See, also, Vegelahn

v. Guntner (Mass.) 44 N. E. 1077, 57 Am. St. Rep. 443, 35 L. R. A. 722.

Reference is also made to the recent case in England, decided by the House of Lords on appeal from the decision of the Court of Appeal, wherein it was held not only that an injunction was an available remedy against the agents of a trades union and against the union itself for preventing interference with the workmen and business of complainant, but that an action at law was also maintainable against the union itself, although unincorporated, for damages sustained by the conduct of its agents. The Taff Vale Railway Company v. The Amalgamated Society of Railway Servants, App. Cas. Law Reports 1901, p. 426. Subsequently it is currently reported (North American Review, March, 1903, p. 413) that a civil suit for damages was instituted by the same plaintiff, which resulted December last in a recovery of $135,000 against the society and its officers for damages for a conspiracy to produce a strike by terrorizing plaintiff's employés.

Pursuant to the leave given in the restraining order, the defendants appeared and filed their answer under oath, denying the alleged conspiracy in all its alleged phases, and denying each and all the threats and purposes alleged in the bill to interfere with or prevent the complainant from performing its duties as common carrier, or to interfere with or prevent connecting lines from interchanging traffic, and fully disavowing any such intention or purpose. The answer further explicitly denies that complainant's employés were satisfied with the condition and compensation of their present service, but avers, in substance and effect, that they (the defendants) were officers and agents of the brotherhoods already referred to, of which many of complainant's employés were members, and that they at the time the restraining order was made were engaged in the performance of the functions and duties imposed upon them by their constitution, rules, and regulations, and at the request and by authority of a large majority of complainant's employés, who were members of their brotherhoods, were in good faith making an effort to better the conditions of their service, and to secure a higher rate of wages therefor, and that any strike which they were about to sanction was intended only for the purpose of peaceably asserting the rights which they demanded. At the same time the defendants filed numerous affidavits in support of their answer, and with this answer and accompanying affidavits the defendants filed a motion to set aside the restraining order. Whereupon both sides, by leave of court, filed further affidavits in support of and against the right to a preliminary injunction, and have now been fully heard in argument on the question.

The ad interim restraining order was made conformably to the provisions of section 718, Rev. St. 1878 [U. S. Comp. St. 1901, p. 580], without notice to the defendants, because it appeared from the averments of the bill that there was immediate danger of irreparable injury unless it was so made. The same statute, however, clearly contemplates that such restraining order is to have no other effect than to preserve in statu quo the rights and property of the parties until a hearing, after notice to defendants, can be had in due form on the motion for a preliminary injunction.

It results from the foregoing that the present status of this case is as follows: The complainant has moved the court for a preliminary injunction, restraining the defendants until the final hearing of this case as prayed for in its bill. The defendants have had due time to appear and have appeared, and both sides have been heard on the motion.

I may here properly remark that counsel have not by proof or argument drawn the federal anti-trust act of July 2, 1890, into consideration in this case. The same will, therefore, not be specially considered, notwithstanding the fact that defendants, by the bill of complaint, are alleged to have threatened its violation.

The question now to be answered is whether on the whole showing, irrespective of the provisional order already made, the complainant is entitled to a preliminary injunction.

Attention has already been called to the law applicable to a situation as disclosed by complainant's bill, and before proceeding to a consideration of the facts it will probably be beneficial to briefly state the law applicable to the situation disclosed by defendants' answer. It is held by the Supreme Court in the case of Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, in substance and effect, that the agreements among employés of a railroad company which are condemned as in restraint of interstate commerce are such as have some direct and immediate effect upon such commerce, and do not include agreements not to work for less than a certain sum, or not to work except under certain conditions, even though the cost of interstate traffic would be thereby enhanced.

In the case of Hopkins v. Oxley Stave Co., 28 C. C. A. 99, 83 Fed. 912, 917, Judge Thayer, speaking for the Court of Appeals of this circuit, makes use of the following language:

"While the courts have invariably upheld the right of individuals to form labor organizations for the protection of the interests of the laboring classes, and have denied the power to enjoin the members of such associations from withdrawing peaceably from any service, either singly or in a body, even where such withdrawal involves a breach of contract (Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310, 25 L. R. A. 414), yet they have very generally condemned those combinations usually termed 'boycotts,' which are formed for the purpose of interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them, by means of threats and intimidation, of the right to conduct the business in which they happen to be engaged according to the dictates of their own judgment."

In the case of Arthur v. Oakes, supra, page 219, 11 C. C. A., pages 320–321, 63 Fed., and 25 L. R. A. 414, Mr. Justice Harlan expresses the rule thus:

"It is the right of the employés, without reference to the effect upon the property or upon the operation of the road, to confer with each other upon the subject of the proposed reduction in wages, and to withdraw in a body from the service of the receivers, because of the proposed change. * * * If in good faith and peacefully they exercise that right of quitting the service, intending thereby only to better their condition by securing such wages as they deem just, but not to injure or interfere with the free action of others, they cannot be legally charged with any loss to the trust property resulting from their cessation of work in consequence of the refusal of the receivers to accede to the terms upon which they are willing to remain in the service."

As said by Judge Caldwell in Ames v. Union Pacific Ry. Co. (C. C.) 62 Fed. 714:

"Organized labor is organized capital. It is capital consisting of brains and muscle. * * * If it is lawful for the stockholders and officers of a corporation to associate and confer together for the purpose of reducing the wages of its employés, or of devising other means for making their investments more profitable, it is equally lawful for organized labor to associate, consult, and confer with a view to maintain or increase wages."

On this subject of organization of labor no one has spoken more clearly or acceptably than did Judge Taft in the case of Thomas v. Cincinnati, N. O. & T. P. Ry. Co. (C. C.) 62 Fed. 803. He there says (page 817), in dealing with a subject very much like that now under consideration, that the employés of the railroad—

"Had the right to organize into or to join a labor union which should take joint action as to their terms of employment. It is of benefit to them and to the public that laborers should unite in their common interest and for lawful purposes. They have labor to sell. If they stand together they are often able, all of them, to command better prices for their labor than when dealing singly with rich employers, because the necessities of the single employé may compel him to accept any terms offered him. * * * They have the right to appoint officers who shall advise them as to the course to be taken by them in their relations with their employer. They may unite with other unions. The officers they appoint or any other person to whom they choose to listen may advise them as to the proper course to be taken by them in regard to their employment, or, if they choose to repose such authority in any one, he may order them, on pain of expulsion from their union, peaceably to leave the employ of their employer because any of the terms of their employment are unsatisfactory."

To the same effect is the case of Vegelahn v. Guntner, supra, wherein Judge now Mr. Justice Holmes says:

"If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that when combined they have the same liberty that combined capital has to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully control."

Allen, J., in delivering the opinion of the majority in that case, speaks on this point with equal emphasis. He says:

"A combination among persons merely to regulate their own conduct is within allowable competition, and is lawful, although others may be indirectly affected thereby."

I might continue at length in the citation of cases stating or illustrating the foregoing propositions, but enough has been said to clearly indicate the general rule, which may be briefly summarized as follows: An employé has an unquestionable right to place a price and impose conditions upon his labor at the outset of his employment, or, unless restrained by contract obligations, upon the continuance of his labor at any time thereafter; and, if the terms and conditions are not complied with by the employer, he has a clear right either not to engage or having engaged in his service to cease from work. What one may do all may do.

They may seek and obtain counsel and advice concerning their rights, duties, and obligations in relation to their employer, and persons interested in their welfare may advise, aid, and assist them in

securing such terms and conditions of service as will best subserve their interests, and what they may lawfully do singly or together they may organize and combine to accomplish.

In like manner, as capital is combined for legitimate purposes, so labor may combine for legitimate purposes, but this right of combination, and the resulting right to strike or quit their employment, is a weapon for the defense and protection of employés, and not a weapon of attack. They may, by peaceful and lawful combination and concert of action, be able to so control the supply of labor as to compel the employer to come to their terms, but they are not at liberty to make use of this weapon to otherwise interfere with or injure the employer or co-employé. The clear line of demarkation, recognized by all the authorities, is that the lawful and permissible strike must not be attended by violence to or destruction of property or by other coercive measures intended to prevent the employer from securing other employés or otherwise carrying on his business according to his own judgment.

Guided by the rules of law already laid down, it now becomes my serious and anxious duty to reach a just and righteous conclusion upon the issues already stated, with absolute fidelity to the truth as disclosed by the proof before me. The proof, in my opinion, fails to substantiate the charge made in the bill to the effect that the complainant's employés are entirely satisfied with their wages and conditions of service.

In the summer of 1902 the Western Association of General Committees, etc., was organized at Kansas City, Mo., for the avowed purpose of securing an advance of 20 per cent. in wages of trainmen and other employés on roads west, northwest, and southwest of Chicago. The trainmen of the Wabash did not at first join this association, but later, through their general committee, notified the president of the company that they had become identified with that movement, and would expect an increase of wages accordingly. The firemen also at about the same time, through their committee, notified the president of the company of their desire for a new schedule of wages and rules. At about the same time the firemen's demands were made, to wit, on November 13, 1902, the president of the railroad company issued an address or general circular to employés, stating, in effect, that he had been giving careful attention to the important question of wages, with the object in view of a fair and equitable adjustment of the wages of all classes. He called attention to the conditions of the service, and announced a certain increase of wages for engine and train men, to take effect December 1, 1902, and requested employés to be conservative, fair, and reasonable. Notwithstanding this concession and request, the committees of both trainmen and firemen who were then in session in St. Louis insisted upon greater concessions, either of wages or rules of service. Repeated conferences and much correspondence ensued, until finally the president of the company questioned the authority of the committees to act for any employés. Thereupon a written authority was secured from a large number of such employés authorizing the committees to represent them. Further interviews and correspondence ensued

between the committees and grand masters of the two brotherhoods of firemen and trainmen to which they belonged on the one hand, and the president of the company on the other, resulting in a failure to agree upon wages and rules of service. Thereupon, on February 20, 1903, the grand masters and committees joined in a written communication, addressed to all the members of the brotherhoods of firemen, trainmen, and conductors, detailing their efforts and proceedings in their behalf, and calling upon them to fill out and return their vote on the proposition of a strike to enforce the demands which had been made in their interest. This vote was taken. The conductors voted against a strike, but the firemen and trainmen voted by more than a two-thirds vote in favor of a strike unless the differences could be adjusted satisfactorily to the committees and officers.

From the foregoing general statement, fairly supported, in my opinion, by all the evidence before me, four things appear: First. That at the time in question there was a very general demand for an increase of wages and change in rules and conditions of service by employés of railroads operated in this region. Second. That such demands had come to the attention of complainant's chief executive officer and had been recognized by him. Third. That the committees and officers of the brotherhoods of which many of complainant's employés were members had undertaken to exercise the functions of their office in behalf of their members by making demands for additional wages and different rules of service. Fourth. That upon their authority being questioned the committees secured written authorization from a large number of members of their orders to represent them in securing the concessions requested.

In the light of these facts, it is clear that the employés claimed to have grievances and were engaged in seeking redress therefor at the time this suit was instituted. The argument on this point took a wide range, and an effort was made to show that the grievances complained of arose with or were initiated by the committees or officers of the brotherhoods, and did not have their origin with the employés themselves. It was also argued that the alleged grievances were not presented to the subordinate officers of complainant company, for their initial consideration, as provided by the by-laws and rules of the brotherhoods in question; but such arguments, in my opinion, are of little value, in the light of the conclusive evidence already detailed, showing an existing recognized claim for additional wages and other benefits.

It is not for me to pass or express any opinion upon the reasonableness of the demands made by or in behalf of the employés. It is sufficient, for the purposes of this case, that such demands were in fact made.

As already seen from the authorities cited, it is the privilege and right of employés to impose any conditions upon their service deemed wise or prudent by them, and to demand such compensation therefor as they deem reasonable, and on failure to secure the concessions insisted upon by them to retire from the service of the employer.

It is shown by the proof that no strikes can lawfully occur by employés who are members of either of the brotherhoods in question

without the sanction of the grand master and general grievance committees of the order. To enjoin them, therefore, from ordering or otherwise causing a strike is, in substance and effect, an injunction against resort to a strike by employés who may be members of the orders for the redress of asserted grievances. This, under well-settled law, cannot be done. See cases supra.

It is contended that the threatened strike was resorted to by the defendants, not in good faith to redress grievances or secure desired concessions, but as a result of a combination and conspiracy to accomplish the ulterior purpose of securing recognition of their unions or brotherhoods, as authoritative agents or representatives of its members, in all their dealings with the company, and also to unionize the roads of the company, and that the defendants did not honestly and fairly secure the two-thirds vote of the brotherhood employés in favor of the strike, but did secure the same by coercion, misrepresentation, and fraud.

An interesting and able argument in support of this contention is drawn from the provisions of the constitution and general rules of the two brotherhoods involved in this litigation, whereby it is made to appear that a strike may be declared which will have the effect of forcing the minority of the brotherhood members who vote against it and also all nonunion employés in service upon the road of the employer out of work without their consent and even against their wishes. Attention is particularly called to the situation disclosed by the proof in this case, that a large majority of complainant's employés working on roads east of the Mississippi river, for whose special benefit largely the threatened strike was intended, voted against it; and it is argued that these and other like considerations disclose that the necessary operative results of the system and methods of the brotherhoods in question are subversive alike of the fundamental rights of the employer to manage his own business, and of the employés to bestow their labor as they will.

This kind of argument enters deeply into the domain of political science, and might well be addressed to a body of constructive statesmen or men originally contemplating a labor organization. It is an argument that would be pertinent against the organization of society into government. The will of the individual must consent to yield to the will of the majority, or no organization either of society into government, capital into combination, or labor into coalition can ever be effected. The individual must yield in order that the many may receive a greater benefit. The right of labor to organize for lawful purposes and by organic agreement to subject the individual members to rules, regulations, and conduct prescribed by the majority is no longer an open question in the jurisprudence of this country. I entirely agree with the views expressed on this subject by Judge Taft in Thomas v. Railway Company, supra, hereinbefore quoted.

Other arguments in support of this last contention are drawn from the fact that the defendants, or others representing their brotherhoods, in the years 1894 and 1901, on the occasion of the labor troubles of those years, insisted upon the right of recognition of properly constituted committees by railroad officers in the adjustment of grievances

with their men, and now insist upon the same right. The proof undoubtedly shows that the defendants, who were duly authorized by the members of their orders to appear for them and secure the redress of their grievances if possible, undertook to represent their principals. The members of the general grievance committees were or had recently been in the employment of the complainant. The grand masters of the orders were not, and, so far as I know, had not been, in complainant's employ. Accordingly there was some quibbling in the conferences and negotiations as to the capacity in which the defendants appeared before the complainant's officials, whether that of individual employé, committee, or adviser; but this does not seem to have been a matter of great importance in the negotiations leading up to the present situation. Even if it had been insisted upon by the defendants, the question of the right of the employé or body of employés to appear, by agent or committee, before their employer, for the assertion of rights or redress of wrongs, being a matter more of business policy than anything else, could not, in and of itself, be the basis of a charge of malicious conspiracy.

It is argued that misrepresentations were made by the defendants in their circular addressed to their fellow members, setting forth the negotiations and proceedings leading up to a failure to agree with the complainant, and that as a result the vote for a strike was brought about by false representations and coercion. I think this charge is not sustained by the proof. There may have been, and probably was, a magnifying of the president's indisposition to meet the defendants for a consideration of their claims; but, in my opinion, neither this nor any other statement made in the circular was intentionally false or misrepresenting, and, taken as a whole, it fairly represented, so far as the evidence before me discloses, the situation as it existed at the time it was sent to the employés.

After considering all the evidence bearing upon the issues now under discussion, and carefully weighing the foregoing and all other arguments of counsel, I am not able to find the existence of the conspiracy to secure recognition as charged.

In this I am fully confirmed by the fact that whatever may have been the loose talk between the defendants or either of them and complainant's president, at any of the personal interviews between them, all the correspondence making formal statements of the demands of the employés, and especially the letter of March 3, 1903, written in reply to the president's request for a specific statement of the grievances for the redress of which they proposed to strike, contained demands relating to wages and conditions of service only. Not a word is found in that ultimatum about recognition of the brotherhoods of committees or unionizing the roads, or anything else except the subject of wages, working rules, and the like.

This leads next to a consideration of the alleged conspiracy to interfere with the complainant's railroad in the discharge of its duties prescribed by the statutes of the United States relative to carrying the mails of the United States and relative to interstate commerce. There is no specific proof of any threat to interfere with the mail service, but such interference is claimed in argument to be necessarily involved and

embraced in the proposed assault upon interstate commerce. There being no allegation of diversity of citizenship between complainant and the defendants, the jurisdiction of this court is invoked solely because of the federal question arising under these statutes.

The matters in issue hereinbefore considered are not in and of themselves subject-matter of federal cognizance, and would not have been argued by counsel, or considered by the court, except upon the theory claimed by complainant, that the acts and purposes disclosed by them were steps or links in the chain leading up to the ultimate conspiracy now under discussion, namely, to interfere with interstate commerce.

Section 3 of the act of February 4, 1887, commonly known as the "Interstate Commerce Act" (24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), provides that:

"Every common carrier subject to the provisions of this act shall according to their respective powers afford all reasonable facilities for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of passengers and property to and from their several lines and those connecting therewith," etc.

Section 10 of the same act, as amended (25 Stat. 857 [U. S. Comp. St. 1901, p. 3161]), provides that:

"Any common carrier * * * or any * * * agent or person acting for or employed by such corporation, who alone or with any other corporation, company, person or party * * * shall willfully do or cause to be done * * * or shall willfully omit or fail to do any act, matter or thing in this respect required to be done * * * or shall aid or abet such omission or failure, * * * shall be deemed guilty of a misdemeanor. * * *"

Section 5440, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3676], provides that:

"If two or more persons conspire to commit any offense against the United States, * * * and one or more parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than $10,000.00, or to imprisonment for not more than two years, or to both fine and imprisonment in the discretion of the court."

The gravamen of the conspiracy coming within the jurisdiction of this court charged against the defendants is that they have maliciously conspired, combined, and confederated to accomplish the object of securing their own recognition as plenary agents and representatives of complainant's employés, by preventing complainant from performing its duties, and by preventing lines of railroads connecting with complainant and their employés from performing their duties, as prescribed by sections 3 and 10 of the interstate commerce act, just quoted.

The charge against the defendants is a criminal conspiracy, within the meaning of section 5440, supra, to violate the laws of the United States, and to induce others to do the same thing; thereby subjecting themselves to civil liability for consequent damages, and particularly to punishment by imprisonment, as prescribed by the last-cited statute. Toledo Ry. Co. v. Pennsylvania Co., supra. It is also now the settled law in this country, as seen in the fore part of this opinion, that any such conspirators as the defendants are charged to be are subject to the injunctive process of this court, and to all the legal and equitable consequences flowing from a violation of the injunctive commands.

The foregoing statutes and principles are adverted to for the purpose of vividly presenting the act or acts alleged to have been threatened by the defendants, with all their attendant consequences. From the foregoing it must appear that only bold, audacious, and reckless men would attempt or intend to engage in the unlawful and criminal acts complained of. These considerations are alluded to as bearing upon the probability or improbability of the truth of the charge made against the defendants. Now, what are the facts?

First, it is argued that the Western Association of Committees formed in the summer of 1902 at Kansas City, with which complainant's employés afterwards became affiliated, was such a combination as would facilitate the alleged conspiracy, and should therefore be regarded as evidence of it. It is true that was an association of the chairman of the grievance committee of certain orders, including the Brotherhood of Railroad Trainmen, and embraced representatives of a large number, if not all, of the railroads operating west, southwest, and northwest of Chicago, and became and was a formidable body. The invitation to membership in the association recites its general purpose to be as follows:

"Changed conditions of work and employment which have come within the last few years have led our membership generally to the conviction that higher rates or standards of pay for conductors and trainmen are fully justified. Voicing that sentiment among the men, members of our general committees for this territory (more or less recently) made efforts to secure the increase desired. They have failed to secure general increases, principally because of inability to successfully answer or controvert the argument that the road in question was paying as much as its neighbors and competitors."

It further appears that the association, after considering other suggestions, finally decided to request an increase of wages of 20 per cent. in freight service, and to make an effort to secure such advance in the wages of passenger conductors, trainmen, and yardmen as would harmonize with the figure so fixed for freight service. It further appears that in urging united action to secure these specific advances the address or invitation stated, among other things, as follows: "It is not expected that these requests will be accompanied by any other complaints or grievances when filed with the officials of any road."

So far as appears in the proof, this association was organized for a lawful and laudable purpose, namely, for the betterment of the condition of employés; and there is nothing before me (except certain affidavits, which will be alluded to later) to indicate that it was intended to accomplish this purpose by any unlawful means.

On December 23, 1902, one of the defendants, as chairman of the general grievance committee of the Brotherhood of Railroad Trainmen, notified the president of complainant's company that the trainmen of his road had become identified with the Kansas City movement, and would expect the increase of wages contemplated by it. So far as disclosed by the proof (except the affidavits just referred to), this general movement in which complainant's employés joined was a combination or union of men engaged in a common pursuit to better their condition by uniting their forces to that end, and was a united effort

recognized as lawful and permissible by the authorities hereinbefore cited, provided and so long as no unlawful means were resorted to for its accomplishment.

As already observed, the record before me shows that the Western Association of Committees is an organization that might facilitate a conspiracy like that charged, if so disposed. This might be said of any organized bodies, like the Masons, Odd Fellows, or the like, but such fact, in and of itself, affords no substantial evidence that the Western Association or the other orders referred to would resort to unlawful and criminal methods to accomplish their purpose.

It is also argued that the union and concert of action of the Brotherhood of Locomotive Firemen and of Railroad Trainmen, as shown by the proof in this case, are evidence of the unlawful conspiracy complained of. As already observed in another connection, this cannot be so. Their purpose being lawful—that is to say, to secure increased wages and better conditions of service—the concert of action is per se lawful and proper, and, in the absence of proof of a purpose to accomplish their object by unlawful means, the usual presumption should rather be indulged that they would not resort to unlawful means to accomplish it.

But it is argued that there is direct evidence tending strongly to show that the defendants were engaged in a conspiracy to interfere with interstate commerce in the way charged in the bill, and that they intended to enforce their demands, whether for recognition or increase of wages, by overt acts, in execution of the conspiracy. This brings me to a consideration of the affidavits alluded to. These are made principally by John W. Schrader, R. J. Robinson, and Clarence A. Hover, and, among other things, detail certain conversations between some of the defendants after March 2, 1903, and certain remarks made by defendant Lee in a speech delivered at a meeting of Terminal Lodge, at Druid's Hall, in St. Louis, about February 3, 1903, which affiants claim to have overheard. These affidavits are very comprehensive, and cover the substance of the charge laid in the bill. One of the affiants swears that he overheard Hannahan and Lee, the grand masters of the two orders of firemen and trainmen, respectively, on several occasions during the week preceding the date of his affidavit, which was March 14, 1903, and particularly on March 2, 1903, talking together in the Laclede and Imperial Hotels of St. Louis in regard (I now use affiant's own language) "to compelling the Wabash Railroad to recognize their organizations, and to deal with them as representatives of the said organizations, in matters affecting the employés of said railroad company, by forcing a strike and tying up and crippling its business and property," and that he heard Hannahan and Lee say, in conversation with others, that "unless the Wabash Railroad Company accede to their demands, and recognize and deal with their unions as such, and with them as representatives of said organizations, they would make it a very serious affair to the Wabash Railroad Company; that arrangements had already been made to tie up all business of the Wabash Railroad and cripple it by preventing the interchange of traffic between it and other railroads; and that no connecting railroad would be allowed to interchange with it," etc.

It cannot but be observed that the language attributed to Hannahan and Lee concerning their arrangements to boycott the complainant's road by preventing the interchange of traffic, etc., is sufficient, of itself, to convict them of a conspiracy to violate the laws of the United States. Section 5440, Rev. St. [U. S. Comp. St. 1901, p. 3676]. The public utterance of such well-phrased self-condemnatory language is not usual .among commonly prudent persons. It is also to be observed that the language imputed to Hannahan and Lee concerning their purpose to ·compel the recognition of their organizations· as plenary representatives of the employés in all their relations with the company is out of harmony with the situation as it existed on March 2d, and for that matter some time anterior thereto.

It has already been pointed out, and in my opinion satisfactorily .demonstrated, that if any such purpose had ever existed on the part of the defendants, or the brotherhoods they represented, it had undoubtedly been abandoned before March 2d. The ultimatum asked for and delivered to the president of the railroad company on that day contained no such requirement. Nothing was then insisted upon but increase of wages and certain changes in working rules, and I may here properly remark that the proof shows that the only substantial matter of difference between complainant and its employés, at least .after February 18, 1903, was whether the wages and rules already established, or conceded to be easily agreed upon, for service west of the Mississippi river, should be applicable to service on lines east of that river.

Such being the facts and circumstances of·the case, the question of recognition of the brotherhoods and unionizing the roads had been, on and prior to March 2d, eliminated from consideration. Is it probable that the controlling spirits of the movement would have made, not only the self-condemnatory, but the unquestionably false, statements attributed to them by the affidavits in question. I think not. It is not deemed necessary to analyze or specifically refer to any of the other affidavits relied upon by complainant. They differ in detail somewhat from that already considered, but in substance are quite like it, so that the same general observations as have just been made are pertinent to them.

Not only so, but each of the defendants charged with making the damaging admissions alluded to unevasively deny the same, and present affidavits of others corroborating in material respects their denials. They not only deny the alleged statements, but affirm again that which is found in their sworn answer, that the intention or purpose attributed to them by the affiants never existed in fact, and does not now exist. Such being the case, the affidavits in question are so far discredited as to be unsatisfactory and unreliable as a basis for the temporary relief now sought.

It is argued that the two telegraphic dispatches sent on March 2, 1903, by the defendants Hannahan and Lee, as grand masters of their respective brotherhoods, to O. D. Ashley, as chairman of the board of directors of the Wabash Railroad Company, and to George Gould, as president of the Missouri Pacific Railroad Company, contained subtle threats to boycott at least the Missouri Pacific Railroad, in the event

the demands of the workmen were not complied with. These dispatches (both being the same) are in the following language:

"On account of the refusal of President Ramsey of the Wabash to meet the demands of the members of the Brotherhood of Railroad Trainmen and Brotherhood of Locomotive Firemen in the matter of working rules, and wages; we hereby notify you that unless Mr. Ramsey recede from his position by noon Tuesday March 3, these men will leave the service of the company, in a body. We have only asked exactly the same rules and rates already granted by the other Gould lines. You can reach us at Laclede Hotel, this city."

I fail to discern in the language of these dispatches any evidence of ulterior or sinister purpose. They appear to me to be the usual and ordinary attempt to appeal to all available influence and power to accomplish a desired purpose. In this connection it is observed that, in this last and final appeal to what was probably supposed by the defendants to be powers behind the throne, the defendants submitted no other claims or demands except those relating to "working rules and wages."

Other facts and arguments have been urged upon the attention of the court by able counsel representing both sides of this controversy, all of which have received careful consideration by the court, but the principles already laid down, the observations made and conclusions reached, are not materially affected by them. They will therefore not be specifically adverted to.

It results that this court should not interfere with the exercise of the right on the part of complainant's employés, who are members of the brotherhoods in question, of quitting the service of complainant in a body, by restraining the defendants, who are officers of the brotherhood, from exercising the functions of their office prerequisite thereto, and that at the present time there is no reason shown for an injunction restraining the defendants from interfering with interstate commerce or the mail service of the United States.

The categorical and unevasive denial, both in sworn answer and separate affidavits, by each of the defendants, of any conspiracy, intent, or purpose like that charged in the bill of complaint, and the apparently candid and ingenuous avowal of no such intention or purpose in the future, together with the appeal made to the honorable record of the brotherhoods in question in connection with labor disturbances in the past and to their professed belief in accomplishing their purposes by peaceful and lawful means only, induce this court to believe, and confidently expect, that whatever measure may be adopted in the present emergency no coercive, violent, or other unlawful means will be resorted to by the defendants, or any one acting for them or under their direction, to accomplish their purposes. Nevertheless this court will be in session and retain jurisdiction of this cause, if desired, so that, in the event of any molestation of or interference with interstate commerce or the mail service, all its lawful powers may be invoked to restrain the same, with the confident assurance that they will be fearlessly and effectively exercised.

I cannot conclude this opinion without expressing the sincere wish of the court that, if the parties are unable to adjust their differences by such mutual concessions as are necessary to that end, the offer made

in open court by defendants' counsel to submit the questions in dispute to the board of arbitration provided for by the act of congress of 1898 will be speedily accepted, and another instance of rational and intelligent adjustment of a business difficulty be exhibited to an expectant public.

The motion for a preliminary injunction is denied, and the ad interim restraining order heretofore made is vacated.