DETERMINED IN THE

## FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

### DURING THE YEAR 1910.

---

**Harry Kemp et al., Appellants, v. Division No. 241 of Amalgamated Association of Street and Electric Railway Employes of America et al., Appellees.**

### Gen. No. 14,917.

Dissenting opinion filed by Mr. JUSTICE MACK, May 14, 1910. Majority opinion *ante* p. 344.

MR. JUSTICE MACK, dissenting. It is unnecessary in this case to consider the effect of malice on what would otherwise be a justification of defendants' acts because their threats were made not out of any ill-will toward complainants or with any intent to inflict useless loss on them, but for the purpose of strengthening their own union.

The authorities are in conflict as to the effect of malice, though in Illinois the Doremus case and others are based primarily on the malicious motive. Moreover in the Horn and Brenshall and Gibson cases the justification of business competition even in the widest sense, under which the union men are ever in competition with the nonunion men in the same trade, utterly fails. 20 Harv. L. Rev. 357, note 2. While in the Doremus case the parties were competitors, the interference was not only malicious in intent but it aimed at and caused third parties to break contracts then in force between them and the plaintiff.

In the present case no malice, no violence, no acts in themselves illegal, and no breaches of contract are involved.

Most rights are relative, not absolute; the right to strike or to threaten to strike and the right to be free from interference in the pursuit of one's occupation are alike subject to limitations.

The nonunion man has a right to seek and to obtain work wherever he desires; he cannot be compelled or coerced into joining a union, as a condition precedent to the exercise of his right. The union man has an equal right to refrain from working or to quit his employment subject only to damages if in so doing he breaks a contract. The employer has a right to refuse to engage an applicant for work. Each of these parties may exercise his right, although as a result one or the other may be injured thereby. If an applicant secures work, he may prevent another applicant from securing it. If he leaves his work, he may thereby damage the business of his employer. If he is not engaged by A. he may be unable to find employment. These consequences are the inevitable result of the exercise of one's legal rights. As long as the means used to accomplish them are free from illegality—defamation, fraud or force or reasonable apprehension of force—and as long as the purpose and intent is, not specifically to injure another but to protect one's own legitimate interests, no objection can be made to the exercise of the right. Moreover what an individual may rightly do, he may ordinarily do in combination with others. Acts done by a combination may, under some circumstances, assume a very different aspect from similar acts done by an individual; picketing by one man may not amount to a threat of violence; picketing by many has been held and under some circumstances clearly may involve such a threat. It is not, however, the mere combination, but the acts done by it, that produces the change.

Jeremiah Smith, at one time Judge of the Supreme

Court of New Hampshire, for many years a leader of the bar of that state and for the past twenty years professor of the law of torts in Harvard University Law School, has made a most valuable contribution to the study and solution of the legal questions affecting trade relations in a series of articles entitled "Crucial Issues in Labor Litigation," published in 20 Harvard Law Review, pp. 253, 345 and 429.   After pointing out the distinction between intent and motive he discusses the nature of the conflicting rights of the parties and their relative character—*i. e.* the limitations which arise when the right of A to be free from interference in his attempt to secure or retain employment conflicts with B's right to freedom of speech and action,—that is not tortious.   After pointing out that in such a conflict defendant's rights are not absolute and that therefore damage done to plaintiff gives rise to a *prima facie* liability which requires justification if it is to be legally excused, he next considers the effect of a combination of defendants and concludes that this would not of itself create a liability that would not have existed against an individual.   He says: "At this day the arguments against labor combinations cannot be allowed controlling force.   The changes in the modes of business, brought about by the inventions coming into common use in the nineteenth century, present practical considerations which are decisive in favor of sustaining the right of laborers to combine. The law, if it were formerly otherwise, must change with alterations in the circumstances of society. * * *

"Combinations of capital are now a necessity. Modern business, in many of its most important forms, cannot be carried on without them.

"A very large proportion of laborers are no longer employed singly, or in small groups, by individual masters.   They are now working in large masses in the employ of persons representing aggregations of capital.  If, then, capital can combine, labor must equally

be allowed to combine. The inevitable tendency of both classes to combine can neither be ignored nor repressed by the courts. Judge Holmes has said: '* * * the organization of the world, now going on so fast, means an ever increasing might and scope of combination. It seems to me futile to set our faces against this tendency. Whether beneficial on the whole, as I think it, or detrimental, it is inevitable, unless the fundamental axioms of society, and even the fundamental conditions of life, are to be changed.' To permit combination to capital and deny it to labor, or *vice versa*, would result in revolution, and ought to so result. '* * * the law of capitalist combination cannot permanently remain different from that of labor combination.' 'The law of combination, as laid down for capital, must end as affecting the law as laid down for labor, or *vice versa*. They cannot be kept in separate compartments.'

"It is plain that workmen, if each negotiates singly with a combination of capitalists, will not attain as favorable terms, either as to wages or hours, as could be obtained by collective bargaining on their part. Some of us are old enough to remember the days when no unions had been formed among the workmen in certain large industries owned by aggregations of capital; and we believe that the laborers did not then, in some respects, enjoy as favorable terms as they deserved. Today, '* * * the mass of wage earners can no longer be dealt with by capital as so many isolated units. The time is passed when the individual workman is called upon to pit his single, feeble strength against the might of organized capital.' * * *

"* * * there is a wide difference between inducing a neutral to take part in a conflict, and uniting (for purposes of conflict) with other persons having similar interests with the defendant and taking, after such union, only such action as any single man might lawfully have taken if acting independently. Granting that each member of a combination may be liable

for persuading his fellow members to take action which is unlawful, *e. g.*, the breaking of a contract, yet this is entirely beside our present line of inquiry. We are now considering whether a combination is unlawful when it takes only such action as could lawfully have been taken by a single man not acting in concert with others.  *  *  *

"Our conclusion is that the intrinsic nature of a combination furnishes no reason for holding that its members incur a greater *prima facie* liability than a single individual."

Richard Olney, formerly Attorney-General of the United States, says in the 42 Am. L. Rev., at p. 164:

"It is archaic—it is a long step back into the past—to conceive of and deal with the relations between the employer in such industries and the employe as if the parties were individuals. Co-operation and combination are the characteristics of modern industrialism, and associations of capitalists and employers in the form of partnerships and corporations long preceded any similar organizations on the part of employes and laborers. Now, however, as labor unions, they permeate and control every branch of every important industry. They have come into being as necessary measures of protection and defense. For the individual laborer to expect to cope with associated and organized capital on even terms or with any reasonable expectation of exacting justice and equity in their relations was seen to be impossible. Only by their united and disciplined strength could those with labor to sell hope to make reasonable terms with the partnerships and corporations desirous to buy. Wherever there is a considerable industry, therefore, we find labor unions—in whose hands the employe places himself and which determine for him wages, hours of labor, and all the other conditions of his employment. The labor unions which officiate at the inception of the laborer's employment and fix its terms are further invested with the right to decide when the employment

shall cease. Their power in this respect, their power to cause employes to stop work by that concert of action which is known as a strike, is the one weapon by which the labor unions protect the interests and enforce the claims of their constituents.''

That there is no difference between the rights of an individual and of a combination to strike is recognized in the majority opinion where it is said: ''The legal right of employes individually and collectively to strike and to announce to their employer their intention to strike, and their reasons therefor, where no contract rights are involved, and with no purpose to injure third persons, has not been questioned by courts in recent years to our knowledge. In Franklin Union v. People, 220 Ill. 355, this right was upheld.''

But does the court correctly express the limitation of the right to strike when it says: ''Where there is a trade dispute between employer and employes, and a strike is resorted to for the purpose of securing an adjustment, with the incidental result that the establishment is closed and third parties are thrown out of employment and loss ensues to them, they are without remedy. But, if no trade dispute exists between employer and employes, and the controversy, as in the case at bar, is between the employes over a matter not connected with their employment—the resignation of complainants from the union—and a strike is inaugurated against the employer to compel or coerce him to discharge an employe unless such employe will become a member of the union, or to force the employe against his will to join the union, such strike is without right and illegal and the rights of such employe are unlawfully interfered with, and he has a right of action for all losses directly resulting from such action. An employe has an absolute right to refuse to belong to the union, and no one under any circumstances has a right to compel him to join it. It is therefore a legal and actionable wrong to him to ob-

struct or interfere with him in the exercise of such right in the manner and for the purpose set forth in the bill.''

The majority opinion seeks to limit the justification for a strike to the case of immediate direct competition, or for the purpose of securing some immediate direct benefit, such as higher wages or shorter hours. But shall the courts say that the purpose of securing more remote benefit will not be a justification for acts not in themselves tortious and giving rise to an action only if unjustifiable? In his vigorous dissent in Plant v. Woods, 176 Mass., at page 492, Chief Justice Holmes says:

''That purpose was not directly concerned with wages. It was one degree more remote. The immediate object and motive was to strengthen the defendants' society as a preliminary and means to enable it to make a better fight on question of wages or other matters of clashing interests. I differ from my brethren in thinking that the threats were as lawful for this preliminary purpose as for the final one to which strengthening the union was a means. I think that unity of organization is necessary to make the contest of labor effectual, and that societies of laborers lawfully may employ in their preparation the means which they might use in a final contest.''

C. R. Darling in an article entitled ''Recent Decisions affecting Labor Unions,'' 42 Am. Law Rev., at p. 200, says:

''Acts which may advance their interests in a general or indirect way should be regarded as lawful no less than acts designed to gain direct advantages in a special instance. The opponents of the union would limit the contest to a form which may be likened to a duel, denying the right of a general engagement or the employment of strategy, as when it is said that men have no right to strike (or to combine to strike, to state their contention more precisely) when they have no dispute with their employer. The Trade Disputes Act in this matter of interference, as in the matter of

combination, has put the matter on a juster basis. The apparent intention is to make the scope of the enactment as broad as the contest between employers and workmen generally, in contrast to limiting it to contests between an employer and his workmen in individual instances. It is enough if the act is done in pursuit of a trade advantage, any trade advantage; it need not be an advantage over the person immediately affected. * * *

"When labor organizes in order to secure the advantage which organization gives, it puts itself in the field as a competitor of unorganized labor and the latter must endure whatever disadvantages it may suffer in consequence. The unions may hold themselves aloof from non-union workmen and from those business houses where the latter are employed, and they have some ground for saying that it is important or even necessary to do so in order to avoid the disintegrating influences of business association with the latter. They may declare non-intercourse with employers of non-union workmen, as they may declare non-intercourse with employers who employ children or who refuse a Saturday half holiday. Whatever we may think of this conduct on economic or moral grounds, there appears to be no element of unlawfulness in it. * * *

"The question of legal right is of course not affected by the question of whether we sympathize with the unions in regard to the matter or not. We may regard it as absurd and unreasonable for the unions to demand union shops generally, as we may regard it as absurd or unreasonable for them to demand a Saturday half holiday, but that does not matter. The important thing to be observed is that the conduct of the union in the former case appears to belong to the same class of acts as their conduct in the latter case, and, if so, its lawfulness is no more open to question in the former than in the latter."

Professor Smith, discussing justification as a defense, says, 20 Harvard Law Rev., p. 356:

"Under this head of justification, in labor cases, the question which is most commonly raised relates to the so-called 'right of competition.' This term 'competition' has been taken over from ordinary mercantile transactions. In labor cases it might be more exact to speak of the defense of self-interest, or conflicts of temporal interest, or the legal limits of the 'free struggle for life.'"

He approves of the foregoing statement by Chief Justice Holmes, adding thereto:

"The result reached by a majority of the New York Court of Appeals in National Protective Association v. Cumming is like that of Judge Holmes; * * *

"In the decision of Allen v. Flood, in the House of Lords, the majority of the Law Lords held that there was not even a *prima facie* tort, and hence they had no occasion to decide what would constitute a justification. But, if that question had been considered material, we should infer that some, at least, of the majority Lords would have taken the same view as Judge Holmes. The opinion of one of the ablest of the majority, Lord Herschell, leaves little doubt as to his concurrence. * * * If the application of Judge Holmes' view in Plant v. Woods can be confined (as we think it can and should be) to threatened 'strikes' in support of the principle of unionism in the strikers' own trade, we should be inclined to favor Judge Holmes' view and hold the justification sufficient."

Dean Ames says, in 18 Harvard Law Review, 418: "Whether employes, who, by threatening to strike, induce an employer not to engage the plaintiff or retain him in a service terminable at the employer's will, are guilty of a tort, may depend upon the motive of the defendants. If they objected to working with the plaintiff because his incompetency would expose them to danger, or because of his depraved character,

no action would lie against them. If on the other hand their motive was to wreak their vengence upon him for his conduct towards them, they must pay the damages inflicted upon him by their conduct.

"As a rule, however, the ultimate object of a labor union in excluding an employe from work by pressure upon the employer, or in injuring the business of an employer by the persuasive or coercive boycott, is not the damage to their victim, but the advancement of the cause of labor. This motive, of course, is commendable. In the great majority of labor cases, therefore, the question whether the members of a labor union are guilty of a tort is a question, not of motive, but of the legal validity of the means adopted for effectuating their motive; and this question must be answered by a careful weighing of considerations of public policy."

Cooke Combinations, 2nd Edition (1909) says at Section 60:

"On this much-debated point there is a seemingly irreconcilable difference of opinion. On the one hand the supposed illegality of the intent is thought to render illegal the act otherwise legal, that is, a strike with such intent is held to be illegal. On the other hand, the act otherwise legal is thought not to be made illegal because of the illegality of the intent, that is, a strike with such intent is held to be legal. To us the latter view seems clearly the sound one. Though a strike with such intent seems sometimes to have been regarded as purely malicious, that is to say, as being purely with intent to injure the employe whose discharge is sought, and without intent to benefit those engaged in the strike, it has been well pointed out that such is not necessarily at least the case; that the legality of such strike may be sustained on the ground that it is a natural incident or outgrowth of the relation of employe, that is, in the interest of the striking employes, or, if what we have called the doctrine of 'solidarity of interest' be given effect, in the interest

of those in 'solidarity of interest' with the striking employes.''

Arthur Cohen, K. C., for many years the leading commercial barrister of England, and a member of the Royal Commission on Trade Disputes and Trade Combinations, says in his memorandum accompanying the report of the Commission, p. 29:

''A workman for reasons either good or bad molests an employer by threatening to take part in a strike if he should continue to employ certain other workmen; could it be for a moment maintained that the employer or any such other workman have any right of action?''

The views of these writers are based on numerous decisions. In Iron Molders Union v. Allis Chalmers Co., 166 Fed. 45, Judge Baker, speaking for the Circuit Court of Appeals of the 7th Circuit, says:

''To organize for the purpose of securing improvement in the terms and conditions of labor, and to quit work and to threaten to quit work as means of compelling or attempting to compel employers to accede to their demands for better terms and conditions, are rights of workmen so well and so thoroughly established in law (Thomas v. Railroad Co., 62 Fed. 803; Arthur v. Oakes, 63 Fed. 320; Wabash R. R. Co. v. Hannahan, 121 Fed. 563), that nothing remains except to determine in successive cases as they arise whether the means used in the endeavor to make the strike effective are lawful or unlawful.    *    *    *

''In a true strike case under the preceding paragraph, because the end is lawful, all means may be called into play except those that are unlawful in themselves.    *    *    *

''If either party, with or without cause, ends an employment at will, the other has no legal ground of complaint.    *    *    *

''Regarding employment at will, those rights reach the limit at this line:  For the maintenance of the incorporeal value of a going business, appellee had a

right to a free access to the labor market, and the further right to the continuing services of those who accepted employment at will until such services were terminated by the free act of one or the other party to the employment. On the other side of this limiting line, appellants, we think, had the right, for the purpose of maintaining or increasing the incorporeal value of their capacity to labor, to an equally free access to the labor market. The right of the one to persuade (but not coerce) the unemployed to accept certain terms is limited and conditioned by the right of the other to dissuade (but not restrain) them from accepting. For another thing that ·must not be forgotten is that a strike is one manifestation of the competition, the struggle for survival or place, that is inevitable in the individualistic society. Dividends and wages must both come from the joint product of capital and labor. And in the struggle wherein each is seeking to hold or enlarge his ground, we believe it is fundamental that one and the same set of rules should govern the action of both contestants. For instance, employers may lock out (or threaten to lock out) employes at will, with the idea that idleness will force them to accept lower wages or more onerous conditions; and employes at will may strike (or threaten to strike), with the idea that idleness of the capital involved will force employers to grant better terms. These rights (or legitimate means of contest) are mutual and fairly balanced against each other.''

In Jersey City Printing Co. v. Cassidy, 63 N. J. 759, V. C. Stevenson says:

''From an examination of the cases and a very careful consideration of the subject I am unable to discover any right in the courts, as the law now stands, to interfere with this absolute freedom on the part of the employer to employ whom he will and to cease to employ whom he will; and the corresponding freedom on the part of the workman, for any reason or no reason, to say that he will no longer be employed; and

the further right of the workmen, of their own free will, to combine and meet as one party, as a unit, the employer who, on the other side of the transaction, appears as a unit before them. Any discussion of the motives, purposes or intentions of the employer in exercising his absolute right to employ or not to employ as he sees fit, or of the free combination of employes in exercising the corresponding absolute right to be employed or not as they see fit, seems to me to be in the air.

"Thus, there is a wide field in which employes may combine and exercise the arbitrary right of 'dictating' to their common employer 'how he shall conduct his business.' The exact correlative of this right of the employe exists, in an equal degree, in the employer. He may arbitrarily 'dictate' to five thousand men in his employ in regard to matters in respect of which their conduct ought, according to correct social and ethical principles, to be left entirely free. But if the 'dictation' is backed up solely by the announcement that, if it is not submitted to, the dictating party will refrain from employing, or refrain from being employed, as the case may be, no legal or equitable right belonging to the party dictated to, which I am able to discern is thereby invaded.

"Some of the expressions which I have used, and which are commonly used, in relation to this subject seem to me to be misleading. Union workmen who inform their employer that they will strike if he refuses to discharge all non-union workmen in his employ are acting within their absolute right, and, in fact, are merely dictating the terms upon which they will be employed. All such terms necessarily relate both to 'how the employer shall conduct his business' and how the employes shall conduct their business.

"The doctrine of the old cases of which we have in New Jersey an interesting example in State v. Donaldson, 3 Vr. 151, which places the employe, when acting in combination with his fellow men, at a tre-

mendous disadvantage as compared with his employer, I think may be regarded as entirely exploded."

In Gray v. Building Trades Council, 91 Minn. 185, the court, after sustaining an injunction against violence, says:

"As to the third subdivision, we are of the opinion that the acts there attempted to be restrained are such as might lawfully be committed, and are not subject to equitable control. It is fair to the trial judge to say, however, in this connection, that the order was drawn by plaintiff's attorney, as is usual in such cases, and was undoubtedly adopted by him as covering only the case made by the complaints. But it goes beyond this and restrains acts other than acts constituting boycotting. This particular provision specifically enjoins defendants, their members, agents and representatives, from going upon the premises where plaintiffs are employed, for the purpose of ordering, directing or notifying men belonging to the various allied unions to desist from work upon the premises by reason of the fact that plaintiffs are employed thereon.

"The authorities, as already noted, very generally hold that a strike is not unlawful, that members of labor unions may singly or in a body quit the service of their employer, and for the purpose of strengthening their association may persuade and induce others in the same occupation to join their union, and, as a means to that end, refuse to allow their members to work in places where nonunion labor is employed. 18 Am. & Eng. Ency. 2nd Ed. 84. They may refuse to have any sort of dealings with an employer of nonunion labor, singly or collectively; they may persuade and induce their members to join them, and there would seem to be no reason why they should be limited as to the place where they may do such acts. There would be nothing wrongful or unlawful in their going upon the premises of the owner, with his permission, where their associates were engaged at work, for the purpose of notifying or ordering them to desist

from work thereon, unless, perhaps, their conduct in that respect be so persistent and annoying to the owner of the premises or contractor as to constitute a nuisance. It is clear, upon authority, that this particular part of the injunctional order goes beyond the limits of the law, and cannot be sustained.''

In Natl. Protective Assn. v. Cumming, 170 N. Y. 314, Chief Justice Parker, speaking for the majority said:

''The propositions quoted recognized the right of one man to refuse to work for another on any ground that he may regard as sufficient, and the employer has no right to demand a reason for it. But there is, I take it, no legal objection to the employe's giving a reason, if he has one, and the fact that the reason given is, that he refuses to work with another who is not a member of his organization, whether stated to his employer or not, does not affect his right to stop work, nor does it give a cause of action to the workman to whom he objects because the employer sees fit to discharge the man objected to rather than lose the services of the objector.

''The same rule applies to a body of men who, having organized for purposes being beneficial to themselves, refuse to work. Their reasons may seem inadequate to others, but if it seems to be in their interest as members of an organization to refuse longer to work, it is their legal right to stop. The reason may no more be demanded, as a right, of the organization than of an individual, but if they elect to state the reason their right to stop work is not cut off because the reason seems inadequate or selfish to the employer or to organized society. And if the conduct of the members of an organization is legal in itself, it does not become illegal because the organization directs one of its members to state the reason for its conduct.

''The principles quoted above recognize the legal right of members of an organization to strike, that is, to cease working in a body by prearrangement until

a grievance is redressed, and they enumerate some things that may be treated as the subject of a grievance, namely, the desire to obtain higher wages, shorter hours of labor or improved relations with their employers, but this enumeration does not, I take it, purport to cover all the ground which will lawfully justify members of an organization refusing, in a body by prearrangement, to work. The enumeration is illustrative rather than comprehensive, for the object of such an organization is to benefit all its members, and it is the right to strike, if need be, in order to secure any lawful benefit to the members of the organization. as, for instance, to secure the re-employment of a member they regard as having been improperly discharged, and to secure from an employer of a number of them employment for other members of their organization who may be out of employment, although the effect will be to cause the discharge of other employes who are not members.

"And whenever the courts can see that a refusal of members of an organization to work with non-members may be in the interest of the several members, it will not assume, in the absence of a finding to the contrary, that the object of such refusal was solely to gratify malice and to inflict injury upon such non-members. * * *

"While I purpose to take the broader ground, which I deem fully justified by the principles quoted, as well as the authorities, that the defendants had the right to strike for any reason they deemed a just one, and further, had the right to notify their employer of their purpose to strike, I am unable to see how it is possible to deny the right of these defendant organizations and their members to refuse to work with non-members, when, in the event of injury by the carelessness of such co-employes, the burden would have to be borne by the injured without compensation from

the employer and with no financial responsibility, as a general rule, on the part of those causing the injury.''

In Clement v. Watson, 14 Ind. App. 39, the court said:

''We cannot believe it to be in accordance with the spirit of our institutions or the law of the land, to say that a body of workmen must respond in damages because they, without malice or any evil motive, peaceably and quietly quit work, which they are not required to continue, rather than remain at work with one who is for any reason unsatisfactory to them. To so hold would be subversive of their natural and legal rights and tend to place them in a condition of involuntary servitude.''

In Perrault v. Gauthier, 28 Can. Supr. Ct., 241, the decision is accurately expressed in the headnote reading:

''Workmen who in carrying out the regulations of a trade union forbidding them to work at a trade in company with nonunion men, without threats, violence, intimidation or other illegal means take such measures as result in preventing a nonunion workman from obtaining employment at his trade in establishments where union workmen are engaged, do not thereby incur liability to an action for damages.''

See too Parkinson v. Council, 154 Cal. 581.

The characterization of appellees' acts in the present case by epithets, the reiteration of the words ''threats'' ''combinations'' and ''conspiratory,'' do not strengthen the bill. Stripped of all superfluous and irrelevant matter, the allegations of the bill that are admitted by the demurrer present this single question (adopting the language of the majority opinion), ''Had the defendants a right to strike for the purpose of inducing the Chicago Railways Company to discharge the complainants as employes of that company because they had resigned from the union and refused to join it again, and with the ultimate purpose of

establishing a 'closed shop' condition on the company's business?''

Had they the right, not to threaten to commit violence, but to threaten to strike, and that, not out of malice towards complainants or for the purpose of ruining them, but in order to protect their own business interests by securing the closed shop—an end deemed by them of the utmost importance in the conflict between capital and labor.

In Gillespie v. People, 188 Ill. 176, the absolute right of an employer to discharge an employe not under a time contract, solely because he would not resign from a union, was upheld even against a statute prohibiting such discharge. And by the highest courts of other states as well as by the Supreme Court of the United States in Adair v. United States, 208 U. S. 161, similar statutes have been declared unconstitutional. If then this be the absolute right of the employer, corporate as well as individual, the board of directors or the numerous stockholders of a manufacturing corporation would not be enjoined from deliberating on the advisability of such a step, or, after having ordered it, from notifying the employes that they must either quit the union or suffer discharge from the employment. That the employes may suffer dire want if they adhere to their principles, or that, through their needs, they may thus be coerced into giving up their legal right to be members of a trades union, is immaterial. The employer's lawful purpose of managing his business as he deems best is held to be a complete justification for his acts not only in the absence of, but even despite legislative prohibition. Are the men to be denied a similar right? Are they to be enjoined from deliberating on the advisability of working only with their fellow members, and after having determined by a vote of 4403 to 49 that their legitimate business interests require this, from notifying the employer that he must employ only

the members of the union or suffer the loss of their services?

That he may suffer not through violence but solely through the loss of their services if he decline to comply with their demand or that, through his needs, he may be coerced into giving up his legal right to maintain an open shop, or that, incidentally, third persons whose interests necessarily conflict with those of his employes, are injured, seems equally immaterial.

Richard Olney, who, as Attorney-General of the United States, led the legal attack on the great strike of 1894, commenting on the decision of the United States Supreme Court (42 Am. Law Rev. 165) says:

"To shut a man from work because he is a member of a labor union, is to deliver an attack upon labor unions of the deadliest character. If the attack cannot be prevented by being put under the ban of the law, the labor unions can hardly do otherwise than assert themselves and repel the attack through a strike. They must be expected so to do not in anger nor resentment necessarily but because their very existence is at stake and non-resistance to the attack would be practical abandonment of the only peaceable means yet devised of safeguarding the interests of labor."

The authorities are clearly in conflict as to whether or not the purpose of securing the closed shop is a valid justification for the threat of a strike. The decisions in Massachusetts and Pennsylvania cited in the majority opinion are opposed to the views expressed in the foregoing citations. The exact question here presented has not come before the Supreme Court of this State. In every Illinois case referred to in the majority opinion, involving labor troubles, in which the grant of an injunction was sustained the elements of force, violation, intimidation or threats thereof were present and the decisions are based primarily thereon.

Moreover in the Barnes case the court lays stress on the fact that the defendants there, unlike the pres-

ent defendants, were no longer in the service of the employer.

In my opinion, the individual liberty would be unduly and improperly infringed, were the unions to be denied the right to strike—that is, to cease work, in order to secure the closed shop or the right to threaten —that is—to give notice of an intention, to strike unless nonunion men, working under agreements which enable the employers lawfully to discharge them at any time and without notice, either joined the union or were discharged, when the purpose of the threat or of the strike is to secure the advantages which union men honestly are to derive from the closed shop.

The great importance of the power of a court of equity to protect life and property by its injunction accounts for the rapid development of this branch of equity jurisprudence in the last fifteen years. Prompt and effective punishment should follow a breach of the injunction, but caution and jealous regard for the liberty of the individual and the free development of the forces of civilization should attend its issuance.

In case of doubt, the parties should be left to their legal remedies.

A court of equity cannot yield assent to the argument that because violence frequently accompanies a strike, therefore the strike itself or the threat thereof shall be enjoined.

In my judgment, a bill which alleges nothing more than is alleged in this case, stated no good cause of action.

If these defendants are content with threatening a peaceable cessation of labor on the part of union men —and nothing more is charged—they are acting within their rights. It will be time to appeal to the court if and when they shall change their attitude and thereby cause in the complainants a reasonable apprehension of violence or other unlawful acts.

In my judgment, the decree should be affirmed.